## J. J. MONAHAN *v.* E. T. MONAHAN.

### October Term, 1903.

Present: ROWELL, C. J., TYLER, MUNSON, START, WATSON, STAFFORD, and
HASELTON, JJ.

### Opinion filed November 25, 1904.

*Trusts—Conveyances to Avoid Taxation—Recovery of
Property—Husband and Wife—Separate Property.*

The fact that a wife assisted her husband in his business and in
caring for the money which was the product of their joint labor
does not make any part of the money thus accumulated her
property.

Money earned by the wife during coverture belongs to the husband,
in the absence of any agreement that it was to be hers.

When a wife has been assisting her husband in his business and in
caring for the money which is the product of their joint labor,
the fact that she, with the consent of her husband, deposits part
of that money in a bank, does not make it her property, when this
is consistent with the manner in which the husband and wife did
business, and with her care of the money so earned.

The *prima facie* inference of a gift arising from the deposit of the
husband's money in the wife's name, with his consent, may be
rebutted by parol evidence, and a resulting trust established in
favor of the husband.

While courts of equity give full effect, as between the parties, to gifts
by husband to wife, they require clear and incontrovertible evi-
dence to establish such gifts.

The test whether a demand connected with an illegal transaction can
be enforced in equity is whether the orator requires the aid of the
illegal transaction to establish his case. When the orator is not

required to disclose his fraud in making out his case, he can have relief, if entitled to it upon the grounds alleged and proved.

When a bill in equity, seeking to impress certain securities with a trust, alleges that the title was taken in defendant's name without his knowledge; that he held them in trust for the orator, and that he secretly took them into his possession, and refused to surrender them, and the issue made by the pleadings is in respect of the title to the property, without reference to any fraudulent conveyance, the orator cannot be denied relief because his evidence revealed a fraudulent purpose to avoid taxation by placing the securities in the defendant's name.

APPEAL IN CHANCERY. Heard on the report of a master at the September Term, 1902, Chittenden County, *Start,* Chancellor. Decree, *pro forma* for the orator. The defendant appealed.

*W. L. Burnap* and *R. E. Brown,* for the orator.

A wife is not entitled to her separate earnings, as against her husband. This is especially true, if she mingles them with the funds of her husband. Schouler on H. & W., § 294; *McCluskey* v. *Provident Institution,* 103 Mass. 300; *Kelley* v. *Drew,* 12 Allen 107.

In the absence of an agreement to that effect, none of the money could become the property of the wife. *In re Brown's Est.,* 65 Vt. 331; *Keniston* v. *Keniston,* 56 Vt. 680; 2 Story's Equity, § § 1375-1381.

Parol evidence may rebut the *prima facie* presumption of a gift from husband to wife, and establish a trust. *Wallace* v. *Bowen,* 28 Vt. 638; *Walston* v. *Smith,* 67 Vt. 542; *Clark* v. *Clark,* 43 Vt. 685; *McClintock* v. *Loisseau,* 2 L. R. A. 816; *Corey* v. *Morrill,* 71 Vt. 51.

To vitiate a trust because of a fraudulent or illegal transaction, the finding of fraud or illegality must be distinct

and unequivocal. *Pittman* v. *Pittman*, 11 L. R. A. 456; *McClintock* v. *Loisseau*, 2 L. R. A. 816.

*H. S. Peck* and. *C. T. Barney* for the defendant.

It is well settled that when the wife, with the consent and approval of the husband, assumes the sole use and control of any of his property, and treats it as her own, this makes such property hers. *Delano* v. *Blanchard*, 52 Vt. 578; *Montpelier, Etc., R. Co.* v. *Langdon*, 45 Vt. 137; *Richardson* v. *Est. Merrill*, 32 Vt. 27; *Childs* v. *Pearl*, 43 Vt. 224; *Bent* v. *Bent*, 44 Vt. 555.

The title to the securities in question was taken in defendant's name for the fraudulent and illegal purpose of avoiding taxation. Equity will not relieve a party from the result of his own fraud. 14 Am. & Eng. Enc. Law (2 Ed.) 275 and 278; *Carpenter* v. *McLane*, 39 Vt. 9; *Robert's Admr.* v. *Lund*, 45 Vt. 82; *Woodward* v. *Wyman*, 53 Vt. 645; *Bank* v. *Brainerd*, 65 Vt. 291.

TYLER, J. The following are the material facts found by the master: The orator resided and practiced law in Underhill about thirty years; he was town clerk twenty-four years, postmaster eleven years, and made from all these sources an annual income of $1,200 to $1,500. He and his wife were poor when they moved to that town, but by industry and economy accumulated several thousand dollars prior to her death in 1900. Their son, the defendant, was born in 1873, and is now a lawyer in Boston, Massachusetts. Mrs. Monahan was a capable woman and assisted her husband in his profession and his public offices. She had the care of the funds of the two offices, also of her own earnings, and to some extent the earnings of her husband, though without any express agreement between them. She kept these

funds, and sometimes moneys collected by her husband, in a bureau drawer, which seems to have been the only place in the house for keeping money and valuable papers. Mr. and Mrs. Monahan and the defendant each had a key and access to the drawer, but by an understanding between the husband and wife the latter had the general care and custody of the drawer and its contents but not to the exclusion of the husband. No books of accounts nor memoranda were kept to show the amount of money placed in the drawer, nor does it appear how much each contributed to the amount thus accumulated. In 1889 and 1891 Mrs. Monahan earned $94, as superintendent of schools and as a member of the board of education.

In March, 1892, Mrs. Monahan began to make deposits in her name in a savings bank and continued to make them until her death. They varied in amounts from small sums to $650.

In 1896 one Batchelder applied to the orator for a loan, and negotiations were had between Mr. and Mrs. Monahan and himself upon the subject. The loan was agreed upon, and the orator requested his wife to see that the papers were properly made, which she did, taking Batchelder's note and a chattel mortgage running to the defendant, who afterwards learned of the transaction, took the note and mortgage into his possession, accepted two renewals of them, finally collected the amount due, used some of the money for his mother's comfort in her sickness and deposited the remainder to his credit in a savings bank. The orator did not know that his son had taken the Batchelder papers until he was looking over the papers in the drawer in December, 1899.

In 1897 one Whipple applied to the orator for a loan and it was agreed by Mr. and Mrs. Monahan that it should

be made.  The latter, at her husband's suggestion, temporarily borrowed $675 on her own note and turned out her savings bank book as collateral security for the loan; the money was handed to Whipple who gave mortgage notes for $800, which included a former loan of $125, and made the notes and a mortgage running to the defendant.  A loan of $200 was made to Whipple the August following, making his entire debt $1,000.  The orator and his wife took part in drafting the notes and the mortgage, which were placed in the drawer.

The orator was employed to foreclose a mortgage against one Agan, in 1897, but paid the debt himself and took new notes and a mortgage running to the defendant.  The orator made or assisted in making all the papers relative to this transaction.  The first of these notes and the first year's interest upon the others were paid to him, and he temporarily used the other Agan note as security for the payment of money that he had occasion to borrow.  When he paid the borrowed money he returned the notes to the drawer.  The defendant did not know of this transaction until some months after it was made, but later on without his father's knowledge he had one of the notes and the mortgage with him in Boston.  In the fall of 1899, in default of payment, this mortgage was foreclosed, but the suit was settled by Agan's deeding the property to the defendant.  The orator was several times solicited to sell this property, but he replied to applicants that it was his son's and he would have to convey it.

There was no agreement between the orator and his wife that she should have the salary received from the post-office, nor the fees for recording papers, nor for drawing legal documents, which service she often performed and received pay for.

The orator knew that his wife kept a bank account in her name and did not in any way interfere with her so doing. They and their son lived in entire harmony, and the parents were agreed in giving the son a good education in high schools, the University of Vermont, and the law school of Boston University.

The orator and the defendant never had any conversation between them respecting these securities until after Mrs. Monahan's death.

In January, 1899, when the defendant was at home on a vacation, he took from the bureau the Whipple and Batchelder notes and mortgages and one of the Agan notes and the mortgage and carried them to Boston, but after a time replaced them, with the exception of the Batchelder loan, in the drawer, where they remained until after his mother's death, when he again took them into his possession and has retained them ever since, though requested by the orator to return them. He had collected the Batchelder debt before his mother's death.

None of this money was earned by Mrs. Monahan in any business carried on by her upon her separate account; her husband never gave her any money to hold as her separate property, and it does not appear that he regarded any of the money that was from time to time placed in the bureau as hers; on the contrary, the money derived from the various sources was not kept separate but was mixed together, and none of it came from the defendant.

I.   Upon the findings it must be held that all the money in controversy was the orator's. The fact that his wife assisted him in his business and in caring for the money which was the product of their joint labor did not make it her property. Even the $94 earned by her was the orator's in the

absence of an agreement between them that it should be hers. Potter v. Potter, 64 Vt., 298, 23 Atl. 856; Re Estate of Brown, 65 Vt. 331, 26 Atl. 638; Re Hall's Estate, 70 Vt. 458, 41 Atl. 508. The deposits of money in the savings bank by Mrs. Monahan in her name, in the circumstances stated by the master, did not change the ownership from her husband to herself. These deposits were consistent with the manner in which the husband and wife transacted business and with the care which she took of the money that they earned together.

Cases cited by the defendant, where the wife before and during coverture received property by gift or inheritance which was regarded by her husband as her separate estate, are not in point. While from such deposits the *prima facie* inference may be that a gift was intended by the husband to the wife, that inference may be rebutted and overcome by parol proof to the contrary, and a resulting trust arise in favor of the husband. *Wallace* v. *Bowens,* 28 Vt. 638; *Bent* v. *Bent,* 44 Vt. 555. This rule applies to the savings bank deposits made in the wife's name and to the fact of the mortgages and the Agan deed being taken in the name of the defendant. *Walston* v. *Smith,* 70 Vt. 19, 39 Atl. 252.

It was held in *Keniston* v. *Keniston,* 56 Vt. 680, that "while courts of equity give full effect as between the parties to gifts by husband to wife, they require clear and incontrovertible evidence to establish such gifts as a matter of intention and fact." In that case the Court remarked that the master had found neither a gift nor an intention to give. See *McClusky* v. *Provident Institution for Savings,* 103 Mass. 300.

II.   The master finds that the orator thought he was being taxed too high in Underhill; that the taxation was

unjust, and that it was his intention not to be taxed upon these securities in that town. In the supplemental report it is stated that the orator's intention was a personal one with reference to his not being taxed thereon, and that he did not intend that the defendant should not return said loans wherever the same ought to be legally taxed, but we consider that this does not change the original finding.

The orator's testimony about the Whipple mortgage is reported as follows: "The listers, a year or two before that, had raised my list $400; it did not please me nor 'Mrs. Monahan; we rather thought it was unjust. Edward had just entered the Boston Law School, and I proposed that we take the mortgage in his name, setting him up as of Boston, Mass., that the listers would not attempt to place that mortgage in the list. It was done so." He further stated that he caused the Batchelder and Agan mortgages and the Agan deed to be made running to his son for the same purpose.

All of the property in controversy was taxable to the orator in Underhill, and it was his legal duty to place it in his inventory each year after the securities were respectively taken. This he did not do, but caused them to be made payable to the defendant, to prevent their being taxed to himself in that town. The defendant entered the Boston law school in October, 1896, but did not change his residence from Underhill to Boston until April, 1899.

The orator claims in his bill that his acts in taking these securities in the defendant's name created a resulting trust in the latter, and he prays the court to declare it a trust and by its decree terminate it and order that the property be returned to the orator.

The question is whether or not the case falls within the general rules in equity, that the court will not enforce a trust

springing out of the complainant's own fraud; that a party will not be relieved from the consequences of his own fraud; that one who has conveyed property to defraud his creditors has not such an equity as will entitle him or his heirs to relief. 14 Am. and Eng. Ency., 2nd Ed., 275, 278. *Peaslee v. Barney,* 1 D. Chip. 331, 6 Am. Dec. 743. In the latter case it was held that it was not competent for an administrator to impeach and set aside an act done by his intestate in his life time in conveying his property to defraud his creditors.

It appears that there was no agreement or understanding between the orator and the defendant that the securities should be taken in the name of the latter; that the orator did not deliver nor intend to deliver the securities to the defendant, and that the defendant took possession of them without the orator's consent or knowledge and refused to return them when requested; that if the defendant had not appropriated them to his use the orator could at any time have taken them from the drawer and held them as his own property.

The essential allegations in the bill are that the securities were taken in the defendant's name without his knowledge; that he held them in trust for the orator; that he surreptitiously took them into his possession and refused to surrender them. The prayer is that the securities may be declared to be held in trust by the defendant for the orator, and that the orator's rights thereto may be enforced. The answer in substance is that the moneys that went into the securities were not the orator's but were in part the defendant's though mainly his mother's, and that he acquired all his mother's interest by her will which had been duly proved. No claim of a fraudulent conveyance by the orator was made in the answer. The issue made in the pleadings was in respect to the title to the property. A majority of the judges are there-

fore of the opinion that the case falls within the well settled rule in equity, that where a party is not required to disclose his fraud in making out his case, he can have relief if entitled to it upon grounds alleged and proved. This rule was adopted by Lord Mansfield in *Hulman* v. *Johnson,* Cowp. 343, where he said:

"The objection that a contract is immoral or illegal as between the plaintiff and the defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake that the objection is ever allowed, but it is founded on the general principles of policy, which the defendant has the advantage of contrary to the real justice between himself and the plaintiff." In *Simpson* v. *Bloss,* 7 Taunt. 246, the Court also recognized the test whether a demand connected with an illegal act can be enforced is whether the plaintiff requires aid from the illegal transaction to establish his case. There the suit was brought to recover upon an illegal wager upon a horse race.

In *Swan* v. *Scott, 11 Sergeant & Rawle,* 155, the plaintiff obtained an award of arbitrators against the defendant, founded on an illegal lottery transaction, and afterwards, the defendant gave the plaintiff his bond in satisfaction of the award. In a suit brought upon the bond it was held that the defendant could not go beyond the award and show that the demand for which it was obtained originated in an illegal transaction. The Court said: "The test whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires the aid of the illegal transaction to establish his case. If the plaintiff cannot open his case without showing that he has broken the law, the Court will not assist him, whatever his claim in justice may be upon the defendant." This test

has been repeated in the following cases: *Thomas* v. *Brady,* 10 Barr, 170; *Scott* v. *Duffy,* 14 Pa. 20; *Evans* v. *Dravo,* 24 Pa. 65.

In *Gilliam, Exr.,* v. *Brown,* 43 Miss. 641, a question was considered respecting a contract for carrying cotton through the enemy's lines in time of war, which acts were in violation of the laws of the United States. In discussing the case the Court said: "It is well settled that after the illegal contract has been executed, one party in possession of all the gains and profits resulting from the illicit traffic and transactions, will not be tolerated to interpose the objection that the business which produced the fund was in violation of law."

It is observed in the opinion in that case that there has been an increasing tendency in Courts to treat the new promise as unconnected with the original contract so as to escape from the unjust consequences of the application of the general rule, that if a contract grows out of an illegal act a court of justice will not enforce it. The following cases are cited: *Armstrong* v. *Tollar,* 11 Wheat, 269; *Craig* v. *Missouri,* 4 Pet. 410; *Roby* v. *West,* 4 N. H. 290; *Patterson* v. *Nicholas,* 3 Wheat. 204; *Wooten* v. *Miller,* 7 S. & M. 385; *Wheeler* v. *Russell,* 17 Mass. 258; *Sheffner* v. *Gordon,* 12 East, 304; *Brooks* v. *Martin,* 2 Wall. 79; *McBlair* v. *Gibbs,* 17 How. 236; *Tennant* v. *Elliot,* 1 Bos. & Pul. 3; *Turner* v. *Russell,* 2 Bos. and Pul. 296.

In commenting upon these cases the Court said in conclusion: "Whilst affording this relief the Courts are not obnoxious to the imputation of giving effect to illegal contracts or encouraging immoral acts. In all these cases the violation of law has already been accomplished, and one party is found in possession of money which belongs to another, and no

detriment can arise further by raising an *assumpsit* to pay it over to the principal."

In *Phalen* v. *Clark*, 19 Conn. 421, the facts were as follows: The plaintiff being the assignee of a lottery granted by the State of Rhode Island and the proprietor of all the tickets in the lottery not sold at the time of drawing, entrusted the defendant, who was residing at Hartford, Conn., and then was and for a long time had been the agent of the plaintiff for the sale of tickets, with a large number of tickets to sell or return. At the time of the drawing of the lottery one of the tickets so held by the defendant drew a prize of $30,000. By a fraudulent combination with one Pinney the defendant obtained information of that fact in advance of the mail, and in his return of sales the plaintiff included such prize ticket as having been sold to Pinney before the drawing. The defendant and Pinney afterwards caused this ticket to be presented to the plaintiff for payment of the prize, representing Pinney as the *bona fide* owner thereof, and the plaintiff, being ignorant of the fraud, paid the prize. On a bill in chancery brought by the plaintiff against the defendant and Pinney to recover back the money so paid it was held that the agency of the defendant to sell terminated with the drawing of the lottery, and that he thereupon became a mere depositary; that the fraudulent combination between the defendant and Pinney and the consequent injury to the plaintiff were entirely independent of any act in which the plaintiff had participated, prohibited by the laws of Connecticut, and consequently that the plaintiff was not precluded from a recovery on the ground of his being *in pari delicto*.

In the opinion the Court remarked: "We suppose it to be a well settled doctrine, that, if a plaintiff requires any aid from an illegal transaction to establish his demand, he

cannot recover it; or in other words, if he is unable to support it without relying upon an unlawful agreement between himself and the defendant, he must fail.   But if the parties have been engaged in business, either *malum in se,* or merely prohibited by law, yet if the cause of action be unconnected with the illegal act, and is founded upon a distinct and collateral consideration it will not be affected by their former unlawful conduct."

*Feret* v. *Hill,* 80 Eng. Com. Law, 207, is in point.   There the plaintiff obtained of the defendant a lease of premises by means of a false representation that he intended to carry on a lawful trade therein.   Having obtained possession, the plaintiff converted them to an illegal use, and the defendant forcibly expelled him.   It was held that the plaintiff might maintain ejectment; that the fraudulent misrepresentation and the subsequent illegal use of the premises were not sufficient in law to avoid the lease.   In the opinion it was said:  "The plaintiff is not calling upon the Court to enforce any agreement at all.   The agreement was an agreement on the part of the defendant to demise certain premises to the plaintiff for a given term.   When the instrument was executed, and possession was given under it, it received its full effect: no aid of a court of justice was required to enforce it.   This action of ejectment is brought, not for the purpose of enforcing the agreement, but the plaintiff asks the Court to afford him a remedy against one who has extruded him from a lawful possession.   There is therefore a manifest distinction between this case and those where the Court was called upon to assist the plaintiff in enforcing an agreement, the object of which was to do an illegal act, as in *Ritchie* v. *Smith.*   In that case both the plaintiff and defendant were parties to an agreement, the very object and intention of which was, to enable one of them to commit an infraction of the law."

In *Taylor* v. *Bowers,* 1 Queen's Bench 291, the plaintiff being in embarrassed circumstances, pursuant to an agreement with another person, delivered his entire stock in trade to that person and took back fictitious bills of exchange. An inventory of the goods was given, but no bill of sale was executed. The object of the transaction was to prevent the plaintiff's creditors from getting their pay in full. The defendant was a creditor of the plaintiff and was cognizant of the arrangement between him and the other person, who, some months later, executed a bill of sale of the goods to the defendant for the alleged purpose of securing his debt. But the plaintiff was not a party to the bill of sale, nor did he sanction or know of it. He afterwards demanded the goods and then brought suit. It was held that the fraudulent purpose not having been carried out, the plaintiff was not relying upon the illegal transaction, and was entitled to repudiate it and recover his goods; that the defendant got no title because he had knowledge of the original transaction. COCKBURN, C. J., in the opinion said: "The action is not founded upon the illegal agreement, nor brought to enforce it, but, on the contrary, the plaintiff has repudiated the agreement, and his action is founded on that repudiation." He cited several cases where money had been paid, and goods delivered, under an unlawful agreement, but there having been no further performance of it, it was held that the party paying the money or delivering the goods might repudiate the transaction and recover his money or goods. The judgment was affirmed in the Court of Appeals. *James,* L. J., remarked: "All the plaintiff has got to say is: 'These were my goods. I was possessed of them. I have never parted with them to anybody. They are my goods still. I never sold them, and I have never given them to anybody in such a way as to

deprive myself of the right to possession of them.' It is the defendant who has got really to show the fraud."

*Taylor* v. *Chester* appears in 6 Eng. Rul. Cas. 477, and the rule is formulated therefrom that: "Where money has been paid under an illegal contract the question whether it can be recovered back depends on whether the parties are *in pari delicto;* and the test is whether the plaintiff can make out his case otherwise than through the medium and by the aid of the illegal transaction to which he himself was a party." Following that case is *Diggle* v. *Higgs,* from 46 L. J. Ex. 721-725, where it was held that: "The deposit of a sum of money by two persons in the hands of a third, to abide the event of an unlawful game between the two, is a wager, and not 'a subscription or contribution to a prize' within 8 & 9 Vict. c. 109, s. 18. Such a deposit may be recovered by the depositor from the stakeholder, if demanded, before it is paid over to the winner."

In the latter case the rule is stated that, "But where money has been paid to a stakeholder upon a wagering agreement which is void, but not illegal, by statute, it may be recovered back if demanded before it is paid over to the winner."

Elaborate notes follow these cases and in the English notes it is stated that the principle in *Taylor* v. *Chester* underlies those cases where property has been conveyed or given for an immoral consideration; and that if the illegal act has been substantially executed the consideration is irrevocable; but where the illegal act remains unexecuted, the consideration paid for it may be recovered. In the American notes to these cases it is said that in this country as in England, the law leaves parties to an executed illegal contract, when equally in fault, to their fate, and therefore will not sustain an action to recover money paid, or goods or lands delivered under

such a contract; and numerous cases are cited. In the same notes it is declared that the doctrine of *Diggle* v. *Higgs* is supported by a multitude of cases, and is the universal doctrine of the American Courts.

The doctrine in *Taylor* v. *Bowers* is approved in *Spring Co.* v. *Knowlton,* 103 U. S. 49, where it is held that a party to a contract, the making of which although prohibited by law, is not *malum in se,* may, while it remains executory, rescind it and recover money by him advanced thereon to the other party who had performed no part thereof. Upon this subject are cited 2 Comyn on Contracts 361; 2 Parsons, 746; 2 Addison, § 1412; Chitty, 944; 2 Story, § 617; 2 Greenl. Ev. § 111.

The cases above cited, and most of those to be found in the books bearing upon this subject, have arisen upon contracts, and the parties seeking relief were *in pari delicto* with the defendants in the illegal contracts. But here neither the issue made by the bill and answer nor the facts reported by the master present a case arising from contract. But the rule is as applicable to this case as it is to cases arising from contracts, for the orator could prove the essential facts in his case without disclosing his fraudulent purpose in having the notes, mortgages and deed made running to the defendant.

*The pro forma decree is affirmed, and cause remanded.*

TYLER, J., dissenting. I am not able to concur with the majority of the judges in some of the views above expressed.

It is true that the orator did not intend that the defendant should acquire title to the securities that were placed in his name; that there was no delivery of them, and that the defendant obtained possession of them wrongfully and against the will of the orator. Do these facts take the case out of the

general rules above stated, so that the orator can have a decree for a return of the property?

It is elementary that while a court of equity will endeavor to enforce justice in transactions between parties, it will act upon the rule that he who comes into a court of equity must come with clean hands. This is declared to be a most important and even universal rule affecting the entire administration of equity jurisprudence as a system of remedies and remedial rights. 1 Pom. Eq. Jur. § 398. It is indeed held, as Pomeroy says in the following section, that this broad principle must be taken with reasonable limitations; that it does not apply to every unconscientious act on the part of the plaintiff; that it does not extend to any misconduct, however gross, which is unconnected with the matter in litigation and with which the opposite party has no concern; and quoting from § 399: "When a court of equity is appealed to for relief it will not go outside of the subject-matter of the controversy and make its interference to depend upon the character and conduct of the moving party in no way affecting the equitable right which he asserts against the defendant, or the relief which he demands." But in § 404, he says * * *; "any really unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience."

Applying this rule to the case in hand, it cannot be held that the defendant's wrongful act was not connected with the orator's transactions in placing the securities in the defendant's name for the confessed purpose of escaping taxation upon them. On the contrary, the conversion of the property by the defendant to his own use was the result of the orator's fraudulent plan. All the steps taken by the orator must be considered,—the formation of the purpose to avoid taxation,

the taking of the securities in the defendant's name, stating his residence as Boston to mislead the listers, the orator's omission to place the securities in his sworn inventory, depositing them within the defendant's reach and the appropriation of them by the latter, constituted one transaction, the last act being the outcome of the former ones. The orator's wrongful acts enabled the defendant to appropriate the securities to his own use.

The opinion of the majority is not placed upon the ground that the defendant's act in appropriating the funds in question to his use was disconnected from the orator's acts, so as to bring the case within the rule in Pomeroy, but it rests upon another rule in equity stated in the opinion. In our judgment the orator is not entitled to the benefit of that rule, for though in his bill he only alleged that his property was in the hands of the defendant who refused to return it, and the answer alleged no fraud, yet the orator in order to prove his case before the master frankly stated his reasons for placing the property in the defendant's hands and thus disclosed his fraud. When the case came into this Court upon the master's report the orator's fraudulent purpose and acts at once appeared.

We are aware that it has been held in some cases that to disentitle the orator to the benefit of the rule, the fraud must be made an issue in the pleadings and established by proof, but such a holding cannot be sound in principle, for, applied to this case, it in effect says to the orator that though he admits that he placed the property in the defendant's name for the purpose of escaping his share of the burden of taxation and he thereby subjected himself to a heavy penalty under V. S. 414, he is entitled to relief because it was not necessary that the fraud should appear in order to make out his case.

As strict a rule should be adopted in this case as is held in suits that are brought to enforce contracts made in violation of statutes, or in cases where one party seeks to be relieved from an illegal contract and the doctrine of *in pari delicto* applies, and expressions of courts in such cases are pertinent.

In *Bank of U. S.* v. *Owens,* 2 Pet. 538, a suit to enforce an illegal contract, it is said in the opinion: "Courts are instituted to carry into effect the laws of the country; how can they become auxiliary to the consummation of violations of law? There can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal."

In *Hall* v. *Coppell,* 7 Wall. 542, a suit brought to enforce a contract void as against public policy: Justice SWAYNE, commenting on the instructions of the court below, that the illegality had been waived by the act of the defendant, says, "In such cases there can be no waiver. The defence is allowed not for the sake of the defendant but of the law itself.' Again, "Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract and void for the same reasons. Where the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded on its own violation." See also *Bank* v. *Lanier,* 11 Wall. 369. In *Hanauer* v. *Woodruff,* 15 Wall. 439, the Court said: "When a contract is thus connected by its consideration with an illegal transaction a court of justice will not aid its enforcement. It is sometimes said that

the test whether a demand connected with an illegal transaction is capable of being enforced at law, is, whether the plaintiff requires any aid from the illegal transaction to establish his case. This test was given in *Simpson* v. *Bloss* by the Court of Common Pleas, in England. But it is too narrow in its terms and excludes many cases where the plaintiff might establish his case independently of the illegal transaction, and yet would find his demand tainted by that transaction. He might, in some instances, establish his case by showing a simple loan of money, or a simple sale of goods, yet the court would hold the contract of loan or sale to be invalid if at the time the money was loaned or the goods were sold he knew they were to be used for an illegal and criminal transaction, and the contract was made to further its execution." *Bartle* v. *Nutt, Admr. of Coleman,* 4 Pet. 184.

In *Roby* v. *West,* 4 N. H. 285, the Court used this language: "The principle, that no court shall aid men, who found their cause of action upon illegal acts, is not only a well settled, but a most salutary principle. It is fit and proper that those who make claims which rest upon violations of the law should have no right to be assisted by a court of justice."

In *Wheeler* v. *Russell,* 17 Mass. 258, the Court declared this rule: "Where the contract is declared void by statute, or is to do a thing directly prohibited under a penalty, or against the policy of the law generally, the case is plain. So where the consideration arises out of, or is indirectly connected with, the violation of some great principle of public policy, the contract is in many cases void. But where the consideration arises out of or is remotely connected with what is merely *malum prohibitum,* the contract is not necessarily void."

*Taylor* v. *Chester,* 4 Queen's Bench 307, has been cited: There the plaintiff sued to recover a bank note that he had

deposited with the defendant as a pledge to secure the payment of money due from him to the defendant. The sum due was for wine and suppers furnished to the plaintiff by the defendant in a brothel kept by the latter to be there consumed in a debauch. The declaration alleged only the bailment of the note; that it was to be redelivered on request, a request, and a refusal to return the note. The defendant pleaded that the note had been deposited to secure the payment of money advanced by and then due her. The plaintiff replied the purpose for which the note had been deposited. *Mellor,* J., in delivering the opinion of the Court said: "The maxim, *in pari delicto,* is as thoroughly settled as any proposition of law can be. It is a maxim of law, established, not for the benefit of the plaintiffs or defendants, but founded on the principles of public policy, which will not assist a plaintiff who has paid over money or handed over property in pursuance of an illegal or immoral contract, to recover it back, for the courts will not assist an illegal transaction in any respect," citing Lord Ellenborough in *Edgar* v. *Fowler,* 3 East 222, and Lord Mansfield in *Holman* v. *Johnson,* Cowp., 343. The Court further said: "In order to get rid of the defence arising from the plea which set up an existing pledge of the note, the plaintiff had recourse to the special replication in which he was obliged to set forth the immoral and illegal character of the contract upon which the note had been deposited. It was therefore impossible for him to recover except through the medium and by the aid of an illegal transaction to which he was himself a party."

The case last cited is a strong authority in support of our contention. It is true that the plaintiff's fraud appeared in the pleadings; but in most cases, and in all cases tried upon the general issue, the plaintiff's fraud would not appear until he

put in his testimony. Can it then be maintained that the plaintiff's fraud thus coming to the knowledge of the court will not defeat his right of recovery?

The disfavor with which courts regard suits founded upon claims tainted with fraud and upon schemes to avoid taxation is illustrated in *Mitchell* v. *Board of Commissioners,* Leavenworth, Kan., 91 U. S. 206. There the facts were that personal property including money on deposit, was listed for taxation as of March 1 each year. The plaintiff in error had a large balance of money to his credit in a bank, and on the 28th day of February gave his check therefor payable to himself in United States notes that were exempt from taxation. They were paid to him and he enclosed them in a sealed package and placed them for safe keeping in the vault of the bank. March 3rd he withdrew the package and deposited the notes to his credit. This was done for the sole purpose of escaping taxation upon his money. The taxing officers however, on discovery of the facts, assessed the money in the bank and the plaintiff filed a bill in equity to restrain the collection of the tax, alleging that the money had been converted into United States notes before the day on which it was to be listed. The Supreme Court of the State dismissed the bill on the ground that, "a court of justice, sitting as a court of equity, will not lend its aid for the accomplishment of any such purpose." The Supreme Court of the United States affirmed the decree and held that "a court of equity will not knowingly use its extraordinary powers to promote any such scheme as this plaintiff devised to escape his proportionate share of the burdens of taxation."

This case must be governed by the rule that governs suits brought to obtain a reconveyance of property conveyed to defraud creditors. In such cases, "The door of the court of

equity is shut against such a claimant." Notes to 1 Pom.
Eq. 401; *Moore* v. *Jordan*, 46 Am. Dec. 641; *Dent.* v. *Fur-
guson*, 132 U. S. 50; *Hildebrand* v. *Willig*, N. J. Eq., 53 Atl.
R. 1035; 14 Am. & Eng. Ency., 275; *Roberts, Admr.* v.
*Lund*, 45 Vt. 82.

We think that upon the facts found by the master, by
reason of the orator's fraudulent acts he is not entitled to the
relief prayed for. The holding of the Court in *Ransom* v.
*Burlington*, 111 Ia. 77, is applicable here: "While one may
lawfully dispose of his property to escape taxation, * * * the
law will not uphold any mere manipulation, under the guise
of disposition, the only effect of which is to defeat a tax."
*Shotwell* v. *Moore*, 129 U. S. 590.

*We think the bill should have been dismissed.*

*Start* and *Stafford*, JJ., concur in the dissenting opinion.