Kaesler v. Schulz, No. 880-03 CnC  (Katz, J., Dec. 23, 2003)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

| STATE OF VERMONT | SUPERIOR COURT |
|---|---|
| Chittenden County, ss.: | Docket No. 880-03 CnCv |

KAESLER and
DeKEERSGIETER

v.

SCHULZ

FINDINGS OF FACT
CONCLUSIONS OF LAW AND
NOTICE OF DECISION

This matter was tried to the court November 17 and 19, 2003. On the basis of the evidence presented, the following decision is announced.

FINDINGS OF FACT

1.      Plaintiffs Kaesler and DeKeersgieter are married, with three children, although currently separated. They moved to Vermont approximately 1998, from Florida. Kaesler started an acupuncture practice, self-employed. DeKeersgieter had been in the moving and storage business in Florida, and kept that Florida business running, while residing here.

2.      The two of them became friendly with defendant Schulz. As the friendship ripened, it appears that Schulz desired to enter into some sort of business, as he did not want to spend the rest of his career working for others. DeKeersgieter had experience in the moving and storage business, but no capital. They eventually formed a partnership, which DeKeersgieter would run, Schulz would put up capital, and a third partner, Goldsmith, would supply warehouse space. The business was soon up and running and apparently succeeding.

3.      Plaintiffs then began to desire owning their own home, close to their respective businesses. They began to look around Burlington's South End, with a real estate broker, Gintoff. As partner and friends with Schulz, plaintiffs mentioned their search to him. Being relatively new to town, and both self-employed, it soon became apparent to plaintiffs that they lacked the credit rating to obtain a mortgage. Mentioning this fact to Schulz, he responded that he would "do anything" to assist them, which appeared to mean that he would co-sign or guaranty a mortgage note and application.

4.      Plaintiffs learned of a duplex dwelling at 59-61 Catherine Street, drove past it, and were very interested.  It seemed to meet their personal needs, particularly location within the school districts where their children were then enrolled.  To see the interior, plaintiffs contacted Broker Gintoff, who could not immediately gain entrance.  But Plaintiff Kaesler knew that one tenant was a patient of hers, and thereby obtained an entrée.  Plaintiffs viewed the house with Gintoff, and determined to make an offer on it.

5.      Plaintiffs did all this selecting, and viewing, and making of an offer without any input from defendant.

6.      Defendant had almost no interaction with the broker, Gintoff.  The broker had looked at a number of houses with the plaintiffs, and had discussed with them their family considerations regarding location.  The broker met with defendant only once, at defendant's office.  The broker understood that defendant would guarantee the mortgage instrument, although this ultimately turned out to take a different turn.

7.      Plaintiffs paid the original $2,000 deposit on the house, to secure the purchase and sale agreement.  When that deposit was returned, apparently at the closing, it was returned to plaintiffs.

8.      At some point, it came to be understood that the mortgage company would not accept a transaction with defendant as a guarantor, but that it could go through if structured with defendant as purchaser, title holder, mortgagee and sole maker of the mortgage note.  That is how it was done at the closing, and in the applications to the mortgage company.

Plaintiffs did not know they would not receive title, prior to it actually passing at closing.

9.      Although the original Purchase and Sale Agreement with the sellers was made out in the names of both plaintiffs and defendant, it was quickly, perhaps even the same day, rewritten in defendant's name alone.

10.      The actual cash paid down for the house, at closing, was paid entirely by plaintiffs.  The closing statement from the August 9, 2000 indicates that "Cash from Borrower" totaled $22,569.21.  It all came from plaintiffs and represented the inheritance plaintiff Keasler received from her father's estate.  In addition to the down payment on the real estate, plaintiffs paid all closing costs.

11.      Neither party retained an attorney for the purchase of the house, in any traditional sense.  An attorney did search the title and handle the closing, George Faris.  Neither plaintiffs nor defendant ever consulted with Faris about the plan to place title in defendant, although all the money was coming from plaintiffs.

12.      At the closing sellers "congratulated" plaintiffs for their purchase of the house.

13.      In terms of anything communicated, 59 Catherine Street was plaintiffs' new home.

14.      Plaintiffs moved in with their children.  Their family has inhabited the house at all times since; defendant never once.

15.     Plaintiffs paid all mortgage, tax and insurance payments.

16.     Plaintiffs began substantial renovation to the house. It had been a duplex, rented to two tenants. Plaintiffs began to convert it to a single-family dwelling, knocking down walls and obviously altering its physical appearance, its utility and its ability to be rented out.

17.     Defendant visited plaintiffs frequently at the house, as they remained friends and partners for a substantial period of time after purchase of the house. He saw and understood all the changes they were making, but neither objected nor played any role regarding those changes which would be consonant with what might be expected of an owner whose property was being seriously altered in ways that probably affect its value. The effect on value is perhaps best proved by defendant's disapproval or distrust of what plaintiffs were doing, voiced during his testimony at trial–"disrepair," bringing a contractor friend to view the house.

18.     In October, 2001, plaintiffs separated, and the husband moved back to Florida, to run his ongoing moving and storage business there. That left the Burlington partnership with defendant with no one to manage it. It was an ongoing business at the time.

19.     In the Fall of 2001, plaintiffs bounced a check for a monthly mortgage payment. That may have briefly put them in default, but the check was quickly made good. When plaintiff Keasler told defendant about the bounced check, he said "no problem." A few other monthly payments were probably late.

20.     By April, 2002, defendant retained attorney Dennis Hill and appointed him an escrow agent to receive mortgage payments from defendants.  Plaintiffs thereafter made their payments to Hill.

21.     Later on, in the course of this unfortunately descending relationship, settlement negotiations occurred between Hill and one Beals, a Florida attorney representing plaintiffs.  We are persuaded that a settlement document was exchanged between the attorneys, but an addendum was confusing to Hill, and was never agreed to.  The agreement was never signed, there was never a meeting of the minds, or agreement as to all terms.

22.     In March, 2002, defendant refinanced the house, to which he held sole legal title.  (PL EX 7) The new mortgage was in the amount of $171,000.  At that time, the balance on the original mortgage should have been $142,134.  (PL EX 15)  Hence, the loss of equity through refinancing is apparently $28,866.  Defendant apparently took the funds released by the refinancing, and paid off his personal credit card debt.  Since the refinancing, defendant has been paying the property taxes.  Plaintiffs have been making approximately the same payments.  It may be that, with a lower interest rate, each such payment reduces principal more than it would have previously, but of course the outstanding principal is $28,866 greater, because of the funds paid over to defendant.  Finally, because the entire payment now goes to the mortgage, with defendant paying the taxes, an accounting will be needed actually to determine what the financial effect of refinancing has turned out to be.

23.     Defendant never told either plaintiff about his refinancing.  They learned of it only after it was accomplished.

24.     The house has probably appreciated in value, rising with the Burlington real estate market, probably twelve to fifteen per cent each year.  (Gintoff testimony)  If the house has increased in value, twelve per cent per year, compounded for three years, the $160,000 price would suggest a current value of $225,000.

25.     Defendant justified his later actions by saying his "credit rating had dropped."  Although his testimony on this point was admitted without objection, it is obviously hearsay, as any rating is the conclusory statement of some credit reporting agency, about which defendant may have been told, and without which statement he would not know of the issue.  What one's "credit rating" is at any point, how it comes to be created, what causes it to rise or fall and what harm may flow from one or another decline in that rating are all subtle questions.  The gnomes of consumer credit may understand these issues, but the court is not persuaded that the rest of us are particularly knowledgeable on the subject.  For these reasons, the court is not persuaded that defendant actually suffered any harm by reason of plaintiffs having been late one month in making a mortgage payment.  At the same time, defendant may well have become a somewhat greater credit risk merely by undertaking the mortgage obligation of the original transaction.

## CONCLUSIONS OF LAW

26.     Where a transfer of property of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid. Restatement (Second) of Trusts §440 (1959).  "As a general rule, when a 'conveyance of land is

made to one person, and the purchase money is paid by another, a resulting trust is thereby created ... for the use and benefit of the person paying the money.'" Tokarski v. Gates, 138 Vt. 220, 222 (1980), quoting Dewey v. Long, 25 Vt. 564, 568 (1853).

27.     The essential elements of this rule are the payment of consideration and the parties' intent at the time of the conveyance. Tokarski, 138 Vt. at 222.  Here, the facts shown at trial command the single conclusion that these parties shared no intention, at the time of the conveyance, other than that the home would belong to plaintiffs.  There was absolutely no communication suggesting anything else; there was affirmative communication that it would belong to plaintiffs.

All the circumstances suggest the same conclusion, even beyond communications between the parties.  The consideration given was Keasler's entire inheritance.  The property was selected solely by plaintiffs for their particular needs.  The property was substantially altered subsequent to the closing to meet plaintiffs' needs, with defendant's complete knowledge and without any complaint by him or any suggestion that his input or consent was required regarding alterations.  Other significant conduct subsequent to the conveyance, supporting this conclusion, is that all mortgage and tax payments were made by plaintiffs up through the time of unilateral refinancing by defendant.

It is therefore inconceivable that plaintiffs intended anything other than that they would be the property's beneficial owners, and beyond any doubt that defendant understood that expectation and worked along with it in receiving title in his sole name.

28.     There are several exceptions to Restatement §440, but none apply.  This is not a situation of title taken in the name of a relative. §442.  It was

not done in order to accomplish an illegal purpose. §444.  Although there may have been some misstatement of facts to the mortgage lender, that does not render the entire transaction one for an illegal purpose.  See Monahan v. Monahan, 77 Vt. 133 (1904) (enforcing a resulting trust where the transaction was legal but whose main purpose was to avoid tax payments).  Moreover, to this point, no lender has actually been harmed.  The first lender has been paid off.  The second is receiving its payments and has the benefit of a valid recorded mortgage.

Section 441 indicates that a "resulting trust does not arise where a transfer of property is made to one person and the purchase price is paid by another, if the person by whom the purchase price is paid manifests an intention that no resulting trust should arise."  Restatement (Second of Trusts § 441 (1959).  We specifically decline to find that any such manifestation here occurred.

29.     We are not unmindful of the fact that defendant undertook a risk in making the mortgage note.  As previously stated, as a question of fact, we are not persuaded by his testimony about diminished credit rating.  It may well be that his credit "point score" is lower merely because he has this substantial debt, to be measured against income, assets and payment history, without regard to whether plaintiffs may have been late in two or three payments.  As a matter of law, we appreciate that he has provided something of value to plaintiffs—he is effectively guaranteeing their payment of substantial debt, under circumstances of some risk.  But this is not a contract action, in which the issue of consideration governs.  Compare Dunn v. Williams, 107 Vt. 447, 452–54 (1935) (imposing a resulting trust because of understanding between parties rather than any exact consideration), with Webster v. Hildreth, 33 Vt. 457 (1860) (finding no resulting trust because of a lack of an agreement despite contributions

to the property). Furthermore, a purchase-money resulting trust stems from the inference that the expectation of those who pay for property is *not* being met and not from trustee issues that would attach to the formation of an explicit trust. See 5 A.W. Scott & W.F. Fratcher, The Law of Trusts § 404.1, at 6–8 (1989).

30.     We therefore conclude that the imposition of a resulting trust is both appropriate and necessary to avoid the unforeseen loss of equity by plaintiffs and the unjust and fortuitous enrichment of defendant. G.G. Bogert & G.T. Bogert, The Law of Trusts & Trustees § 455, at 266 (1991) ("There can be no question that such a payment is a proper basis for a resulting trust of this type . . ."). The question remains what remedy is appropriate to the situation as it has evolved?

31.     The problem of remedy is one of several parts. First, to ensure that plaintiffs end up with the real estate which is rightfully theirs; second, to consider whether conditions should be placed on that basic remedy; and third, to secure all the benefits for which plaintiffs are rightfully entitled.

32.     The first remedy issue seems clear. The court must declare that defendant holds the real estate on Catherine Street in trust for plaintiffs, and not otherwise. At this point, we presume that such a declaration will suffice. Furthermore, for the reasons which follow we are reluctant to go beyond the declaratory in the initial formulation of an equitable remedy.

33.     We halt at the declaratory, and for now decline to order the conveying of the property to plaintiffs. For defendant is still obligated under the mortgage note for a very substantial sum. At least conceivably, plaintiffs have diminished the value of the property by their unilateral

renovations. Although we state this in analyzing the appropriate use of discretion, we make clear that it is not a finding of fact that such diminution in value has occurred. At present, defendant is liable on a mortgage note which may well have a present indebtedness of $170,000. Until this obligation is lifted from his shoulders, he should not be ordered to yield legal title. G.G. Bogert & G.T. Bogert, The Law of Trusts & Trustees § 543(V), at 444, § 465, at 411–14 (1993).

Although the present mortgage indebtedness is $170,000, the indebtedness which plaintiffs undertook is probably much closer to $140,000.

34. Having come to the conclusion that defendant holds the property as mere trustee for plaintiffs, we must inevitably move to the further conclusions that his unilateral refinancing was in his sole interest; was actually contrary to the interest of plaintiffs; and is therefore not something for which they are responsible. Shelly v. Landry, 79 A.2d 626, 628–29 (N.H. 1951) cited in Sparks Farm, Inc. v. C.I.R., T.C. Memo 1988-492 ("In a resulting trust, the legal owner holds the property for the beneficial owner but cannot properly exercise any control or dominion over the property in his own right."). Instead, we conclude that the defendant is in breach of the resulting trust and liable for the equity removed from the Catherine Street property through refinancing. Restatement (Second) of Trusts § 206 cmt. j (1959).

35. The proper and equitable remedy is therefore to direct that at such time as plaintiffs shall deliver up the extent of the original mortgage indebtedness, they shall be entitled to conveyance by him of all his legal title to the Catherine Street property. Restatement (Second) of Trusts § 410 cmt. b (1959); see also Little v. Watson, 2002 WL 31467471 (Tenn.

Ct. App.) (Ordering titleholders to convey to beneficiaries as soon as the latter obtains refinancing to release titleholders' mortgage); 5 A.W. Scott & W.F. Fratcher, The Law of Trusts § 410 (1989).

36.     This, however, will still not make plaintiffs whole. They bought the property, defendant held it for them as mere trustee. They are therefore entitled to the increase in value which the market has afforded. He has no right to reach into the equity developing on the property and help himself to some portion. Sparks Farm, Inc. v. C.I.R., T.C. Memo 1988-492; Restatement (Second) of Trusts § 206 (1959). For having done so, defendant has been unjustly enriched through his fiduciary position. See Restatement (Second) of Trusts § 206 (1959); 5 A.W. Scott & W.F. Fratcher, The Law of Trusts § 501, at 523 (1989). The law imposes a constructive trust on the equity removed from the house at refinancing, which makes defendant liable to disgorge the value so obtained. Legault v. Legault, 142 Vt. 525, 529 (1983).

37.     The conclusions here reached do not compensate defendant for the risk he undertook, the real service he performed. But he never sought or bargained for any such compensation. He did not contract for compensation and may not therefore obtain it unilaterally.

38.     The record presently before the court does not permit precise calculation of the amount of such restitution. We cannot yet enter a judgment. The matter is therefore appropriate for an accounting, to arrive at a present sum representing appropriate restitution for the misappropriated equity in the property.

39.     To sum up, the plaintiffs are entitled to a declaratory judgment that they are the beneficial owners of 59-61 Catherine Street and are entitled to all sums wrongfully taken from their equity by defendant

measured by the original amortization schedule, at such time as plaintiffs proffer the principal amount still due plus actual costs of conveyance, defendant shall be obliged to convey good legal title and discharge the present mortgage.  By so discharging, he will presumably make full restitution of the equity wrongfully taken.  Until such events occur, defendant should continue to make tax payments, when due.

    If the parties cannot come to an agreed accounting, within 21 days hereof, they shall each submit their proffer thereof.

Dated at Burlington, Vermont, _____, 200__.


            _____

                Judge