### BENTLEY v. TIBBALS.

(Circuit Court of Appeals, Second Circuit. March 9, 1915.)

No. 186.

1. COPYRIGHTS ⊂⇒1—STATUTORY PROVISIONS.

The exclusive right of multiplying and vending copies of an intellectual work is of purely statutory origin.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 1; Dec. Dig. ⊂⇒1.]

2. COPYRIGHTS ⊂⇒86—INFRINGEMENT—EQUITABLE RELIEF.

An alien and subject of Great Britain, who secured in 1906 a copyright under the laws of the United States for a book entitled "Bentley's Telegraph Cyphers," and who subsequently published in London a larger book, entitled "Bentley's Complete Phrase Code," and secured for that work a British copyright, on the title page of which appeared the statement that the copy included the "Telegraph Cyphers" entered under act of Congress, and who, prior to and subsequent to 1910, sold copies of the later work in the United States printed from type set up in London, in violation of Copyright Act March 4, 1909, c. 320, 35 Stat. 1075, was not guilty of misconduct justifying denial to him of an injunction restraining the publication and selling of his book, copyrighted under the laws of the United States, within the maxim that one coming into equity must come with clean hands, for the maxim is limited to misconduct connected with the matter in litigation, and does not apply to misconduct which is unconnected therewith, for the unlawful importation and vending of the book is not so connected with the subject-matter of the suit as to justify the application of the maxim; the offense committed being against the United States, and one of which it alone may take cognizance.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 79, 80; Dec. Dig. ⊂⇒86.]

3. EQUITY ⊂⇒42—PLEADING OF DEFENSES—NECESSITY.

The maxim that one who comes into equity must come with clean hands need not be pleaded to be available, and where the evidence discloses the unconscionable character of a transaction, equity will of its own motion apply the maxim and deny relief.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 119, 120; Dec. Dig. ⊂⇒42.]

4. COPYRIGHTS ⊂⇒29—ACQUISITION—NOTICE.

The statutory requirements as to notice of a copyright must be strictly complied with, though a slight variance in the words, or in the order of the words, does not invalidate the notice, where the matter is substantially the same.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 29, 30; Dec. Dig. ⊂⇒29.]

5. COPYRIGHTS ⊂⇒63—ACQUISITION—ABANDONMENT.

An alien author, procuring a copyright in the United States of a work, and then publishing a larger work in the foreign country, including the

copyrighted work, and obtaining in the foreign country a copyright, with notice that the work includes the work copyrighted in the United States, may not restrain one from publishing the work published in the foreign country, where no one inspecting the foreign work can tell what portion of it has been taken from the work copyrighted in the United States, and what part is not.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 60; Dec. Dig. ⊜➾63.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here on appeal from a decree of the District Court of the United States for the Southern District of New York, entered on November 4, 1914, granting an injunction restraining the defendant from printing, publishing, and vending books or cyphers like or substantially like the book and cyphers copyrighted by plaintiff and entitled "Bentley's Telegraph Cyphers," and awarding plaintiff profits and damages.

George H. Gilman, of New York City, for appellant.

Henry M. Wise, of New York City, for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. The bill of complaint is filed by an alien and subject of the king of Great Britain. The complainant resides and has his principal place of business in London, England. The defendant is a citizen of the United States, residing in the city of New York, state of New York, and does business under the name of the American Code Company.

Complainant alleges that he secured in 1906 a copyright under the laws of the United States for a book entitled "Bentley's Telegraph Cyphers," and that he is the sole and exclusive owner of the copyright in that work. He states that the defendant, without his license, and against his will, and in violation of his rights, and in infringement of his copyright, has unlawfully, wrongfully, and injuriously printed, published, and sold books containing telegraph cyphers which are exact fac simile copies of complainant's cyphers as contained in the copyrighted book. He seeks an injunction, an accounting of the profits, and damages.

[1] The English House of Lords, in Donaldson v. Becket, 4 Burr. 2408 (1774), decided that the exclusive right of multiplying and vending copies of an intellectual work is of purely statutory origin. And the Supreme Court of the United States rendered a similar decision in Wheaton v. Peters, 8 Pet. 591, 8 L. Ed. 1055 (1834). The earliest statute on the subject was passed in England in 1710. St. 8 Anne, c. 19. Connecticut passed a copyright act in 1783, which was entitled "An act for the encouragement of literature and genius." It recited in its preamble that:

"It is perfectly agreeable to the Principles of Natural Equity and Justice that every Author should be secured in receiving the Profits that may arise from the Sale of His works, and such Security may encourage Men of Learning and Genius to publish their Writings; which may do Honor to their Country and Service to Mankind." Acts and Laws of Conn. Jan. Sess. 1783.

By that act copyrights were to be granted for 14 years, with the benefit of a second term of the same length. The act was passed in January and Massachusetts passed a like act in March and New Jersey in May of the same year. St. 1782, c. 58. Virginia followed in 1785 (12 Henning's St. at Large, p. 30), and New York in 1786 (Laws 1786, c. 54). These acts were all passed prior to the adoption of the Constitution of the United States. But Congress, in the exercise of the power conferred upon it by the Constitution "to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries," passed the first federal statute on the subject on May 31, 1790. 1 Stat. p. 124, c. 15.

The act of 1790 granted copyright to such author only as may be "a citizen of the United States or resident therein," and this continued to be the policy of Congress in the subsequent acts passed upon the subject until 1891. Prior to that time, and beginning as early as 1837, Congress was asked many times to grant protection to foreign authors and it repeatedly refused to do so. In this respect the United States pursued for years a policy less liberal than Great Britain and other foreign nations.

By the act of Congress of March 3, 1891, the provisions of the copyright laws of the United States were extended to citizens and subjects of a foreign state or nation only when such state or nation permits to citizens of the United States of America the benefit of copyright on substantially the same basis as to its own citizens, or when such foreign state or nation is a party to an international agreement which provides for reciprocity in the granting of copyright, by the terms of which agreement the United States of America may at its pleasure become a party to such agreement. 26 Stat. p. 1106, c. 565. And the President of the United States, acting under the provisions of the act, issued a proclamation on July 1, 1891, in which he declared that, as citizens of the United States had the benefit of copyright in Great Britain on substantially the same basis as the subjects of that country, those subjects were entitled to the benefits given under the Copyright Act of Congress of 1891. 27 Stat. pp. 981, 982. And under the Copyright Act of 1909 the subjects of Great Britain are still entitled to the benefit of the privileges of copyright in the United States.

The act in section 8 declares that the author of any work made the subject of copyright by the act shall have copyright for such work under the conditions and for the terms specified in the act:

"Provided, however, that the copyright secured by this act shall extend to the work of an author or proprietor who is a citizen or subject of a foreign state or nation, only:

"(a) When an alien author or proprietor shall be domiciled within the United States at the time of the first publication of his work; or

"(b) When the foreign state or nation of which such author or proprietor is a citizen or subject grants, either by treaty, convention, agreement or law, to citizens of the United States the benefit of copyright on substantially the same basis as to its own citizens, or copyright protection substantially equal to the protection secured to such foreign author under this act or by treaty; or when such foreign state or nation is a party to an international agreement which provides for reciprocity in the granting of copyright, by the terms of

which agreement the United States may, at its pleasure, become a party thereto.

"The existence of the reciprocal conditions aforesaid shall be determined by the President of the United States, by proclamation made from time to time, as the purposes of this act may require." Act March 4, 1909, c. 320, 35 Stat. 1077 (Comp. St. 1913, § 9524).

In accordance with the provisions of the act the President of the United States on April 9, 1910, issued his proclamation declaring that under the conditions of the act the subjects of Great Britain were entitled to the benefits of the act. 36 Stat. pt. 2, p. 2685.

[2, 3] The complainant alleges in his bill that at the time he took out his copyright in the United States and subsequent thereto the kingdom of Great Britain and Ireland—

"grants by treaty, convention, agreement, and law to citizens of the United States the benefit of copyright on substantially the same basis as to its subjects, and copyright protection substantially equal to the protection secured to plaintiff under the provisions of the laws of the United States relating to copyrights."

The defendant does not deny the complainant's right to take out his copyright, or that he failed in doing so to comply in all respects with the requirements of the statute. It appears, however, that complainant, after having secured his copyright in the United States of "Bentley's Telegraph Cyphers," published in London in 1907 a larger book entitled "Bentley's Complete Phrase Code," which contained a substantial amount of the "Cyphers," together with additional matter, and secured for that work a British copyright, on the title page of which appeared the following statement:

"This Code includes the Telegraph Cyphers entered according to act of Congress in the year 1906, by E. I. Bentley in the office of the Librarian of Congress at Washington, D. C. All rights reserved. Entered at Stationer's Hall."

Copies of this work, both prior to and subsequent to 1910, he sold, not only throughout the United Kingdom, but in the United States and other foreign countries; and it is claimed that "Bentley's Complete Phrase Code" has acquired a recognized and enviable reputation both in England and the United States for reliability, usefulness, and economy in telegraphing or cabling. And it further appears that defendant is selling in the city of New York a book of the same size and color of binding as the complainant's work, and on the cover of which he has placed the words "Bentley's Complete Phrase Code" in gilt letters of the same size as are used in the English publication, and that it contains an exact and complete phrase code published by plaintiff, as to subject-matter, preface, specimens, and title page, with certain unimportant exceptions. It is this work which it is claimed infringes the copyright which complainant secured in this country in 1906 upon "Bentley's Telegraph Cyphers"; the essential features of the "Cyphers" being embodied in the work.

The defendant bases his defense upon the fact that complainant had never taken out a copyright in this country of "Bentley's Complete Phrase Code," and that complainant lost his United States copyright in the "Cyphers," so far as he had published them in "Bentley's Com-

plete Phrase Code." In other words, his claim is that he had a perfect right to copy an uncopyrighted book, and that complainant, by importing into this country "Bentley's Complete Phrase Code" and by selling it here, lost his right to be protected in this country on anything which it contained; that the publication of parts of a copyrighted book as parts of an uncopyrighted book involves an abandonment of the copyright.

The act of Congress provides that, during the existence of the American copyright in any book, the importation into the United States of any copies thereof, although authorized by the author or proprietor, is prohibited unless they have been printed from type set within the limits of the United States, or if the text be produced by lithographic process or photo-engraving process that has been wholly performed within the limits of the United States. Act 1909, §§ 15 and 31. And such prohibition existed both prior to and subsequent to 1910, when "Bentley's Complete Phrase Code" was imported. R. S. U. S. § 4956 (3 U. S. Comp. Stat. 1901, p. 3408; and U. S. Comp. Stat. 1911, p. 1482; Comp. St. 1913, §§ 9536, 9552). The evidence shows that the book was printed from type set in London. The importation of it into the United States by the complainant was in itself a wrongful act, and books so imported are liable to forfeiture under the law. In Harper & Bros. v. Donohue & Co. (C. C.) 144 Fed. 491, 499 (1905), it was held that a defendant who had imported a book published in England and not copyrighted there, and who reprinted it in this country, could not defend his infringement of the American copyright of the same matter by alleging that he had copied the uncopyrighted English book. As he had imported the work the importation of which was prohibited by statute, the court declared that he could not found legal rights on acts made unlawful by being prohibited.

Has the plaintiff been guilty of iniquity, so as to debar him from relief in a court of equity? It is a venerable maxim of equity that one who comes into equity must come with clean hands. A court which seeks to enforce on the part of the defendant uprightness, fairness, and conscientiousness also insists that, if relief is to be granted, it must be to a plaintiff whose conduct is not inconsistent with the standards he asks to have applied to his adversary. In other words, the plaintiff's own conduct must not have been characterized by a want of good faith or a violation of the principles of equity and righteous dealing.

In Edward Thompson Co. v. American Law Book Co., 122 Fed. 922, 59 C. C. A. 148, 62 L. R. A. 607 (1903), this court declared that an author who pirated a large part of his work from others would not be entitled to ask to have his copyright protected. This conclusion was based upon the general proposition that equity would refuse its aid to a suitor who had himself been guilty of the same inequitable conduct which he denounced in others. In that case complainant was the publisher of two encyclopædias of law, and defendant was engaged in compiling its Cyclopædia of Law and Procedure, two volumes of which had at that time appeared. The method adopted by complainant in preparing the articles for its publication was similar to that employed by defendants, but the latter had not copied a word of complainant's

text, and its editors had not been permitted to so much as open complainant's books.

Counsel stated upon the argument that complainant, having imported his English work into this country in violation of the act of Congress, is not in a position to invoke the aid of a court of equity in this suit. To this counsel for defendant replied that the defense of unclean hands must be affirmatively pleaded, and that plaintiff not only had not pleaded it, but had failed to urge it before the trial judge, and therefore could not have the benefit of this defense in this court. We think that both counsel for complainant and counsel for defendant have fallen into error. The maxim to which reference has been made need not be pleaded. When the evidence discloses the unconscionable character of a transaction, the court, whether the maxim is pleaded or not, will of its own motion apply the maxim. Dunham v. Presby, 120 Mass. 285 (1876); Teoli v. Nardolillo, 23 R. I. 87, 49 Atl. 489 (1901). We do not, however, think the maxim invoked is applicable to the case before the court. The maxim does not apply to every unconscientious act or inequitable conduct of the plaintiff. It it limited to misconduct connected with the matter in litigation, and does not apply to misconduct which is unconnected with the matter in litigation. 1 Pomeroy's Eq. Jur. § 399. It is true that complainant violated the law of the United States in importing the Phrase Code into this country and selling it here. But, as was pointed out in Kinner v. Lake Shore, etc., R. Co., 69 Ohio St. 339, 344, 69 N. E. 614, 615 (1903):

"A court of equity is not an avenger of wrongs committed at large by those who resort to it for relief."

It is not sufficient to debar a suitor for relief that he has committed an unlawful act, unless that unlawful act affects the matter in litigation. The offense which Bentley committed in wrongfully importing the work was not a wrong done to this defendant, or one which in any wise prejudiced him. It was an offense committed against the United States, and one of which it alone could take cognizance. The unlawful importation and vending of the book here is not so connected with the subject-matter of the present suit as to justify the application of the maxim to the plaintiff's suit:

The act of Congress of June 18, 1874 (18 Stat. 78, c. 301), provided as follows:

"Sec. 4962. No person shall maintain an action for the infringement of his copyright unless he shall give notice thereof by inserting in the several copies of every edition published, on the title-page or the page immediately following, if it be a book; or if a map, chart, musical composition, print, cut, engraving, photograph, painting, drawing, chromo, statue, statuary, or model or design intended to be perfected and completed as a work of the fine arts, by inscribing upon some * * * portion" of the face or front thereof, or on the face of "the substance on which the same shall be mounted, the following words, 'Entered according to act of Congress in the year —— by A. B., in the office of the Librarian of Congress, at Washington.'"

The history of this provision seems to begin with the act of April 29, 1802 (2 Stat. 171, c. 36), which required every person seeking to obtain a copyright of a book to cause a copy of the record to be in-

serted at full length in the title page, or in the page immediately following the title of the book.

The act of February 3, 1831 (4 Stat. 436, c. 16), declared that no person should be entitled to the benefit of that act unless he should insert the prescribed words in the published copies of the book. And the act of July 8, 1870 (16 Stat. 198, c. 230), changed the language of the act of 1831, so as to declare that no person should maintain an action for the infringement of his copyright unless he inserted in the several published copies of the book the notice prescribed. The act of March 3, 1905 (33 Stat. 1000, c. 1432) providing for copyright for foreign publications makes the notice necessary only in all copies of such books sold or distributed in the United States. And the act of March 4, 1909, provides:

"That any person entitled thereto by this act may secure copyright for his work by publication thereof with the notice of copyright required by this act; and such notice shall be affixed to each, copy thereof published or offered for sale in the United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section twenty-one of this act." Comp. St. 1913, § 9530.

In Thompson v. Hubbard, 131 U. S. 123, 9 Sup. Ct. 710, 33 L. Ed. 76 (1889), the Supreme Court held that the requirement of the statute in regard to printing the prescribed notice of copyright in the book was a condition precedent to the perfection of the copyright. Bentley printed the notice in his American book, and no question is raised but that he did everything which the law required him to do in perfecting his original copyright. Whatever difficulty exists in this case grows out of what he did or failed to do afterwards.

[4] The courts hold that the statutory requirements as to notice must be strictly complied with, although a slight variance in the words, or in the order of the words, if the matter is substantially the same, will not invalidate the notice. See Burrow-Giles v. Sarony, 111 U. S. 53, 4 Sup. Ct. 279, 28 L. Ed. 349° (1884); Falk v. Schumacher (C. C.) 48 Fed. 222 (1891); Hefel v. Whitely Land Co. (C. C.) 54 Fed. 179 (1893); Bolles v. Outing Co., 77 Fed. 966, 23 C. C. A. 594, 46 L. R. A. 712; Id., 175 U. S. 262, 20 Sup. Ct. 94, 44 L. Ed. 156 (1899).

The only object of the notice required by the statute is to give notice of the copyright to the public. Thompson v. Hubbard, supra. It is given to the public to prevent any person from making himself subject to the penalty imposed for violation of the copyright without knowledge of the copyright. Sarony v. Burrow-Giles (C. C.) 17 Fed. 591 (1893). And when the notice is printed on the title page, or on the page immediately following it, of the book copyrighted, there is no possibility of the public being misled as to what matter is copyrighted. But where copyrighted matter is afterwards reprinted in an uncopyrighted work, the question of what notice should be given to the public of the copyrighted matter, if the copyright as to such republished matter is to be preserved, is a question of some difficulty.

[5] In United Dictionary Company v. Merriam Company, 208 U. S. 260, 266, 28 Sup. Ct. 290, 291 (52 L. Ed. 478) (1907), Mr. Justice Holmes, writing the opinion of the court, stated that it was in that case

"unnecessary to discuss nice questions as to when a foreign reprint may or may not be imported into the United States under the present provisions of our law." The facts of the present case do not impose that duty upon us, but they do impose the duty of determining the effect of a publication by the author in England of a substantial part of a work copyrighted by him in the United States, which English publication is imported and sold by him in this country. In the case the Supreme Court had before it the question whether an injunction could issue to restrain the infringement of copyright in "Webster's High School Dictionary." The American publishers of the work made a contract with English publishers under which it furnished them with electrotype plates of the work and they published it in England, omitting notice of the American copyright. The English work had a different title, "Webster's Brief International Dictionary," and had some other differences on the first 3 and last 34 pages, but otherwise was the same. The English publishers agreed not to import any copies of their work into this country, and also to use all reasonable means to prevent an importation by others. The United Dictionary Company, which did not own the American copyright, purchased in England and brought to this country a copy of the English work, and proposed to reprint it in the United States, claiming that the failure to insert in it notice of the American copyright forfeited the right of the owner of the copyright to bring suit for its infringement. The question was whether the omission of notice of the American copyright from the English publication, with the assent of the American owner, destroyed the latter's rights, under the act of Congress requiring notice to be inserted "in the several copies of every edition published." The court declared that the statute did not require notice of the American copyright on books published abroad and sold only for use there, and the decree of the court below sustaining the bill was affirmed. The court in the course of its opinion said:

"But it hardly would be argued that because no copyright had been taken out in England and therefore the reprint there was lawful, an American copyright could be defeated by importing the English book and reprinting from that."

In the case at bar it is sought to defeat the American copyright by importing an uncopyrighted English book containing a substantial part of the copyrighted American book. The book having been imported, defendant claims the right to reprint the entire English work. It is, however, to be noted that in the case at bar the importation and sale of the English work was not only not "without the consent of the owner," but was the act of that owner. Bentley, the owner of the American copyright, published the English book, and then imported and sold it in this country. By so doing he may have made those portions of his American book which he incorporated into the English book publici juris.

It is conceded that copyrighted matter may be included with uncopyrighted matter and not lose the protection of the statute. In Black v. Henry G. Allen Co. (C. C.) 42 Fed. 618, 9 L. R. A. 433 (1890), it was held that a book copyrighted in this country and published by the con-

sent and license of the author as a part of a foreign encyclopædia, the remainder of which was the production of aliens not protected by the copyright laws of the United States, did not thereby become public property, and could not be used without the consent of the author in a reprint of the Encyclopædia. The plaintiffs in that case, Adam and Charles Black, of Edinburgh, Scotland, were the publishers of the Encyclopædia Britannica, Ninth Edition. Three of the articles contained in the twenty-third volume of the Encyclopædia had been copyrighted in the United States. One of those articles had been written by Francis A. Walker, who had assigned to the Blacks the right to republish it in the "Encyclopædia Britannica, Ninth Edition" and not otherwise, "the said Walker retaining the right to print, publish, copy, and vend the said copyrighted book in every form and manner other than as a part of said Encyclopædia Britannica." Another of the articles had been written by Professor Alexander Johnston of Princeton University, who had made a similar assignment to the Blacks, and whose administrator was one of the plaintiffs in the suit.

The defendant printed an American edition of the Britannica, including the twenty-third volume, and as a part of it the matter copyrighted by Walker. Suit for infringement was brought by the Blacks and Walker. The court declared the question to be:

"Does the fact that the proprietor of a book copyrighted in this country has permitted an alien publisher of an encyclopædia to publish his book as part of such encyclopædia enable another person, without other authority, to publish in this country the copyrighted article as a part of his reprint of such encyclopædia, the remainder of which is publici juris?"

The court answered the question in the negative.

"If a poem or an essay for which a copyright had been secured in this country by the author, a citizen of the United States, should be permitted to be inserted in a volume of poems or essays, a part of which was publici juris, it could not reasonably be claimed that the author had thereby abandoned his copyright, and that his book could be reprinted, by itself, without his consent, in this country. It cannot be contended that the defendant would have a right to reprint Walker's or Johnston's treaties in separate volumes without the consent of the respective proprietors. Can, then, the poem or essay be printed, without the consent of the author, as a part of an unauthorized reprint of the entire volume?"

The defendant based his defense in that case on two grounds. The first was that the work as a whole was a foreign work, and the bulk of the volume publici juris; aliens then not being able to secure copyright in the United States. The second was that the insertion of Walker's and Johnston's articles was for the manifest purpose of preventing citizens of the United States from reprinting that volume, which would have been, but for those articles, publici juris, and therefore was an attempt which should not receive the favor of the court. Neither of these contentions found favor with the court. "If the author has a valid copyright," said Judge Shipman, "it is valid against any unpermitted reprint of his book; and the fact that his book is bound up in a volume with 50 other books, each of which is open to the public, is immaterial." The complainants obtained an injunction and an accounting. See Black v. Henry G. Allen Co. (C. C.) 56 Fed. 764

(1893). But the fact is not to be overlooked that in Black v. Henry
G. Allen Co. the Blacks inserted in the several copies of every edition
of the Encyclopædia the following notice printed on the title page.

"The following article in this volume is copyrighted in the United States of
America, viz.:

"United States.

"Part I. History and Constitution. Copyright 1888 by Alexander Johnson.

"Part II. Physical Geography and Statistics. Copyright 1888 by
Josiah D. Whitney.

"Part III. Political Geography and Statistics. Copyrighted 1888 by
Francis A. Walker."

And in that part of the Encyclopædia in which the matter written
by Professor Johnson appears there is inserted at the head of the arti-
cle, "Copyright 1888 by Alexander Johnson." A similar notice is in-
serted at the head of the article written by Mr. Whitney and at the
head of that written by President Walker. It was possible, therefore,
for any one to tell on an inspection of the volume the exact copyrighted
matter it contained, and there was no necessity to seek out the original
American copyrighted book, and then compare it with the English pub-
lication, in order to ascertain what was and what was not copyrighted.

The case at bar involves a different state of facts. In this case the
author of the English work is informed that it "includes the Telegraph
Cyphers entered according to act of Congress in the year 1906, by E.
L. Bentley in the office of the Librarian of Congress, at Washington,
D. C." But no one, on inspecting the English work, can tell what por-
tion of it has been taken from the Telegraph Cyphers and what part has
not. That he can only ascertain by securing a copy of the Telegraph
Cyphers and comparing it word by word with the Code. In other
words, there is nothing which indicates to the reader what portion of
the work is protected by American copyright and what is not, but he is
left to ascertain that fact for himself by a verbal comparison, word for
word, of the American and English publications.

The conclusion at which we have arrived is that the complainant is
not entitled to an injunction to restrain the defendant from publish-
ing and selling "Bentley's Complete Phrase Code" as prayed for in the
bill. We have arrived at this conclusion, not because he reprinted the
matter in England without taking out copyright in that country. That
he could do without impairing any of his rights in the United States.
But his difficulty arises out of the facts that in his English publica-
tion of the Code he embodied the Telegraph Cyphers, or a substantial
part of that work, and imported the same into the United States, and
sold it here, without any notice in it by which the public could know by
inspection the copyrighted from the uncopyrighted matter.

In our opinion one who so embodies copyrighted with uncopyrighted
matter that one reading his work cannot distinguish between the two
has no right to complain if the book is republished by third parties.
It is true that Bentley did insert the statutory notice in the Code by
which he directed attention to the fact that the Telegraph Cyphers
were included in the new publication, but the statutory notice was in-

tended by Congress to apply to publications as a whole—where the author is copyrighting the work as a whole. It was not intended by Congress that, by inserting notice in an uncopyrighted work that it contains copyrighted matter, the author could thereby prevent the republication by a stranger of the uncopyrighted book. In this case the English book covers more than 200 large pages and the original American work less than 40. One cannot ascertain what part of the English book contains the copyrighted matter taken from the American book, unless he is able to obtain from some source a copy of the original work and compare it letter by letter and word by word with the book subsequently published in England. This we do not think he is called upon to do. If one intends to assert his exclusive right to publish and sell copyrighted matter, he must so clearly indicate the matter in which he has the exclusive right that the public upon inspection can determine the question of its own rights therein. He cannot require the public to search the markets to find a copy of his copyrighted book, then purchase it, and then compare it word by word with the uncopyrighted work.

We do not decide in this case that Bentley has lost his copyright in the Telegraph Cyphers, so that any one is at liberty to reprint that book. Whether he has or has not lost that right is not before us and is not decided. What we do decide is that he has no standing in court to prevent by injunction the publication of the Complete Phrase Code, which is an uncopyrighted work, the whole of which the defendant was at liberty to reprint, including the matter taken from the Telegraph Cyphers, although copyrighted, as there is nothing in the work which indicates the copyrighted from the uncopyrighted matter.

The decree should be reversed, and the bill dismissed; and it is so ordered.