Argued at Pendleton October 4; modified December 11, 1934;
opinion modified on petition for rehearing January 22, 1935

# PLATT *v.* JONES
(38 P. (2d) 703, 39 P. (2d) 955)

*Robert D. Lytle,* of Vale, and *Chas. W. Ellis,* of Burns, for appellants.

*P. J. Gallagher,* of Portland (Geo. B. Guthrie, of Portland, and Hallock, Donald & Banta, of Baker, on the brief), for cross-appellants.

BEAN, J. This is an appeal from the decree of the circuit court declaring a trust in favor of the plaintiffs and intervening plaintiffs and requiring the defendant James Jones to account for a one-half interest in the property of William Jones, deceased. Both parties appeal from the decree.

The facts pertaining to this litigation are delineated in the briefs about as follows: William Jones, for a number of years, was engaged in the ranching, livestock and banking business in Malheur county, Oregon, at and around Juntura. He organized a corporation, for the ownership of his land and livestock and most of his properties, named the Jones Land and Livestock Company. Being advanced in years, he decided to and did, through the dissolution of the corporation and execution of other instruments, start his three sons, James, Forrest and Ben, in business for themselves, by giving them equal ownership in the properties and at the same time deeding substantially one-third of the real estate to each of his sons, each giving to him a real estate mortgage in the sum of $21,538.44, on the respective bodies of real estate conveyed to them. His object appeared to be to place the title in his sons but to hold the mortgages as a check and control if they attempted to dissipate the property. The plan being consummated, the boys commenced the operation of the properties. It was soon found that the three sons could not get along well, so Ben sold his interest to James, which gave James a two-thirds interest. But James and Forrest could not get along together, so James conveyed to Forrest, who thereby became the owner of all the properties, subject to the three large mortgages. Ben went to Ontario, where his father staked him in a garage. Having trouble with his wife, he left the state, and the garage property was left on his father's hands. When James disposed of his interest he left the state and did not return for several years. When he did return he rented the garage property in Ontario from his father and continued in the garage business until his father called him back to operate the properties. Forrest had operated them from the time he bought James out, until in the summer of 1927, during which time he became deeply in-

debted to his father and was operating at a loss, as well as having domestic troubles, so that his father was compelled to take back all the properties which were in Forrest's name. Due, however, to the domestic trouble, Forrest was unable to get his wife, Bernice, to convey the real property back, but promised to do it as soon as he was able.

In October, 1913, Forrest married the party to this suit, as guardian, who is now Nettie Duvall, but after the birth of their child, Alice Annette Jones, in 1919, Forrest and Nettie were divorced in November, 1919. In September, 1921, Forrest married the party to this suit, as guardian, who is now Bernice Platt, and of this second marriage there were two children, Marjorie Marie and William Jefferson Jones. August 20, 1927, Bernice, the wife of Forrest, commenced suit for divorce, which, at the time of the death of William Jones, June 25, 1928, had not been disposed of. This is called the first divorce suit. In *Jones v. Jones,* 130 Or. 242 (279 P. 641), this court dismissed the suit. On October 27, 1922, William Jones executed a will in which he made his son Forrest residuary legatee. On August 25, 1927, he executed a subsequent will in which he made his son, defendant James Jones, residuary legatee and executor, without bonds. On September 16, 1927, at the suggestion of their father, Forrest Jones and defendant James Jones executed a written agreement, as follows:

"This Agreement, made and entered into this 16th day of September, 1927, by and between James Jones, hereinafter designated as the first party, and Forrest Jones, hereinafter designated as the second party, Witnesseth:

"That Whereas, the father of the first and second parties hereto, William Jones, has made, signed and executed a certain instrument in writing, being the Last Will and Testament of the said William Jones, together with any codicils attached thereto, bequeathing and de-

vising to the first party a large proportion of the real and personal property belonging to William Jones.

"And Whereas, it is desired between the parties hereto and it is the actual intent of the said William Jones that the property devised and bequeathed to the first party shall be equally divided between the first and second parties after the final termination of certain litigation now pending in the Circuit Court of Malheur County, Oregon, in which Bernice V. Jones is plaintiff and Forrest Jones, defendant;

"And Whereas, said Last Will and Testament of the said William Jones has been executed with the full and complete knowledge of said suit;

"Now, Therefore, it is hereby agreed by and between the parties hereto, that in consideration of one dollar this day paid by the second party to the first party, the receipt whereof is hereby acknowledged, and the brotherly relationship existing between the parties, that upon the death of the said William Jones, notwithstanding any clause which may be contained in the Last Will and Testament, that all property, both real, personal and mixed, which may be or may have been devised and bequeathed to the said first party, shall actually be the property of the first and second parties jointly and that upon the final termination of the suit now pending in the Circuit Court of Malheur County, Oregon, hereinbefore mentioned, that the said first party shall assign unto the second party an undivided one-half interest in each and all of the said real, personal or mixed property which may be bequeathed or devised by the Last Will and Testament of the said William Jones to the said first party, or to make such division equally between the parties hereto as may be mutually agreeable to the parties to this instrument.

"In Witness Whereof the parties hereto have hereunto set their hands and seals this 16th day of September, 1927. (Signed) James Jones, First Party (Signed) Forrest Jones, Second Party."

This agreement was signed by both parties thereto, and one copy was delivered to Forrest and one to his father, William Jones. On June 25, 1928, William Jones

died. The will was duly probated in Malheur county. William Jones had been made a party defendant in the first divorce suit and, therefore, it was incumbent upon James Jones, executor of the estate of William Jones, to have himself substituted in the cause in place of his deceased father.

On August 3, 1929, Forrest commenced a divorce suit against Bernice, called the second divorce suit, and made James Jones, as executor of the estate of William Jones, a party. She again asked for the same property rights as in the first suit, and Forrest, in countering her demands, made an affidavit and also filed an answer to her cross-complaint and a reply in the second divorce suit, in which he stated that he had no property or interest in the estate of William Jones, save for the $500 legacy.

See also statement of facts in the case of *Platt v. Jones,* 145 Or. 310 (26 P. (2d) 554).

Defendant asserts that the alimony and maintenance and other provisions of the decree in the divorce suit, being larger than Forrest could pay, application for substitution was made, and Ralph W. Swagler, on behalf of Forrest, for whom he was attorney, made an affidavit in which it was stated that Forrest had no other interest in the estate of William Jones save for the legacy of $500. We find in Forrest Jones' affidavit in the case of *Forrest Jones v. Bernice V. Jones,* supra, in answer to motion of Bernice V. Jones asking for attorney's fees, suit money and temporary alimony, in regard to the interest of Forrest Jones in the property involved and the deal made prior to the marriage of Forrest Jones and Bernice V. Jones, when the property was deeded by the father to the sons, as follows: "and in the property involved, defendant (Forrest Jones) had only *contingent interest* and that subject

to the payment of the purchase price represented by this mortgage and other liens thereon''. (Italics ours.)

In the second divorce suit the parties settled their property rights by payment of $2,500 to Bernice V. Jones, whereupon Forrest and Bernice, after they had agreed as to property rights, joined in two deeds whereby title to the real estate which had been in the name of Forrest when he agreed to turn back all of the property to his father in payment of his obligations, which exceeded the value of the property, was placed in James Jones, residuary devisee of the estate of William Jones. Afterwards a decree of divorce was entered on December 2, 1929, in favor of Forrest. Prior to February 8, 1930, the date of the last will and testament of Forrest Jones, he had married, for the third time, Alice Frances, to whom he left a legacy of $5,000; also, $5,000 to the trustees for the benefit of Alice Annette, a daughter by his first marriage; $5,000 to trustees for the benefit of Marjorie Marie, a daughter by his second marriage, and devised to William J. Jones, a son by his second marriage, all of the remaining property, stating that part of same was the ''Jonesboro Ranch''. This last named ranch was a part of the property which had been deeded to James Jones as executor. The appraisement of the property of the estate of William Jones, deceased, showed a valuation of $157,300.56. The residuary estate, delivered to James Jones, as residuary legatee and devisee, was valued at $141,938.18. Due to the fact that Forrest was unable to convey the real estate back to his father by good deeds, the real estate was not listed, but the notes and mortgages were listed and appraised as of the value of the land upon which they were secured. The state inheritance tax, the federal estate tax and the legacies, all having been paid, the estate

was finally closed on July 15, 1931, and the residuary estate delivered to James Jones in accordance with the last will and testament. Forrest Jones died testate March 14, 1930. He was possessed of a band of sheep and some other personal property. He was largely indebted to James Jones for money and credit loaned. As the two trustees, also executors named in the will of Forrest, declined to act, F. J. Froman, father of Bernice, was appointed administrator with the will annexed of the estate of Forrest Jones. He qualified and sold the personal property and sheep to James Jones, who gave credit for the purchase price on the obligations to him from Forrest. Mr. Froman since died. Bernice Platt was substituted as legal representative. Various pleadings were filed and issues raised. On March 24, 1932, the cause was heard by Hon. D. R. Parker, who made findings of fact and conclusions of law. Decree was entered on July 11, 1932, declaring James Jones individually and as executor of the last will and testament of William Jones, deceased, to be trustee for the use and benefit of the estate of Forrest Jones, deceased, and as such trustee charged with a half interest in all of the residuary estate of William Jones, passing under his last will and testament. An appeal from this decree was taken to this court and dismissed, as not final. See *Froman v. Jones,* 141 Or. 42 (16 P. (2d) 21). Later Hon. Fred W. Wilson took testimony in the case and heard the final account rendered by an accountant, and, on February 2, 1934, made supplemental findings of fact, supplemental conclusions of law and entered a final decree.

Plaintiffs and interveners contend that by virtue of the written agreement heretofore set out, defendant James Jones was charged with one-half of the residuary estate of William Jones, deceased, as a trustee for the use and benefit of his brother Forrest, and that by

reason of his repudiation of such duty and his failure to recognize such obligation he should have imposed upon him the status of a constructive trustee and such a trust should be imposed upon the residuary properties.

The defendants have set up separate defenses which, in substance, are as follows: First, a general denial of the allegations of the complaint; second, that by reason of certain things which happened in the divorce case between Forrest Jones and plaintiff Bernice Platt, his former wife, the doctrine of unclean hands may be invoked and bar the plaintiffs from maintaining this suit; third, that the same facts would estop the plaintiffs from maintaining this suit; fourth, that certain deeds were executed by Forrest Jones, which affects their pleading by way of estoppel.

The deposition of Ralph W. Swagler, an attorney who formerly practiced at Ontario, was taken in California. His testimony shows, in substance, that William Jones came to his office about the middle of September, 1927, after he had prepared the will of August 25, and stated to the witness that he and his sons, Forrest and James, had agreed, prior to making the will, that they would divide the property equally between Forrest and James in the event of the death of William Jones, while the last will was in effect. He declared that Forrest and James had agreed to this and wanted to know if that agreement could be put in writing so that it might be signed by James and Forrest. The following day these parties returned to his office, and the agreement, heretofore set out, was prepared and read over to William Jones in the presence of Forrest and James and delivered to William Jones. The agreement was not signed in the office. The witness identfied Exhibit A as being a copy of the agreement he prepared, saying: "I am unable to produce a copy of the contract

and I do not find one in my files, but I have before me a copy of the agreement taken from Mr. Kester's files, which I recognize as the instrument I prepared."

After Mr. Swagler went to California, Bruce R. Kester acted as attorney for Forrest Jones in the divorce suit. Mrs. Mabel Judd Kester, an attorney at law, and widow of Bruce R. Kester, now deceased, produced the office records of Bruce R. Kester and testified that the office records of Mr. Kester showed a conference with Forrest Jones regarding the agreement with James Jones and a conference with James Jones and Forrest Jones on September 14, 1928; that she delivered a copy of the agreement to P. J. Gallagher, one of the attorneys for plaintiff, and that the same was part of the files and records in the office of Bruce R. Kester.

Nora W. Veste testified, in substance, that she had copied the original signed agreement, and also testified to writing the letter which was introduced in evidence. Plaintiff Bernice Platt testified that Forrest Jones showed her the original contract signed by James and Forrest; that Forrest read it to her and she looked on, while he was reading it. Ben Jones, brother of Forrest and the defendant James, testified that defendant told him: "We have an agreement about the division of this estate, but nobody is going to see that agreement." Later, defendant wrote his brother Ben two letters, which are in evidence and read, in part, as follows: "Pete (Forrest) and I have agreed on a split as soon as the trial is over." Another letter reads in part: "Pete (Forrest) and I agreed to split as soon as the estate is settled. The suit we are in was put off until January, so guess we can get fixed up after that. I took the Woodruff ranch and Upper ranch and bank stock,

let him have the rest, split everything else even.'' The defendant, James Jones, testified:

''A. Well, after that will was drawn this agreement was drawn up and signed up and everything, and right soon after it was drawed up we talked it over and Bill Jones—

''The Court: Who do you mean by 'we'?

''A. We, that is my brother, Forrest, and William and myself; and my father, after we had signed it, we were still talking about it and he was studying it then, and the very words he used, he says, 'This damn thing ain't what I want.' So from then on that agreement was supposed to be out of existence, and I haven't got one, never had one, and I don't know what became of it.

\* \* \* \* \*

''A. My father and Forrest came in with the agreement and it was in the evening, possibly about seven o'clock. \* \* \* they were both together and one of them, I don't know which one, said, 'Here, we want you to come over and see this,' or something like that, and I knew that they wanted me to sign it and I never read it over but I expected to come right back, and I signed the agreement. \* \* \* and so I signed it up and Forrest signed it and then I went back into the garage and took care of all the work there was to do out there and came back in, and they had went over against the wall and was sitting there. \* \* \* Forrest and my father were both sitting there, and my father had— I don't know whether he had all the agreements. There was only two; I remember of signing one of them, but he was reading it at that time, and so then I sat down with them and began reading, one of them, and just about that time he said, 'That isn't what I want.' So I didn't study the agreement any further, I just passed it up. So then right after that Forrest went out and I sat there and talked to my father, and he just explained to me in a general way what he wanted to do for the other boys.''

Defendant further testified on cross-examination that his father told him, in substance, he wanted him to

care for the other boys, that he talked about it several times before his death. "A. Well the principal thing that was in his mind, he wanted to say [see] that layout held together and operated on a profitable basis, and he wanted to see us all have something. Q. That was his desire for all you boys, to participate in the property? A. Yes."

■ We think that the decree of the circuit court, rendered by Judge D. R. Parker, finding in plaintiffs' favor as to a trust, was right. It appears that Bruce R. Kester, during his lifetime, was consulted in regard to the agreement, Exhibit A, and had his clerk, Mrs. Veste, copy the same. She testified that she made the copy from an original signed agreement. We also have the deposition of Mr. Swagler and the letters that defendant James Jones wrote to Ben Jones, and testimony of the defendant that he signed the two copies of the agreement, that when he last saw them they were in the possession of his father and brother. He said on cross-examination: "Well, it might have been in force for fifteen minutes." He further testified that he had orally promised his father that an appropriate division of the estate would be made with his brothers, and he admitted writing the letters to his brother Ben in which he stated the manner in which the estate would be divided, in effect that he and Forrest had agreed to split the property. We think that the testimony shows the basic agreement was fully and completely executed and delivered, and that the testimony supports the finding of the circuit court in regard to a trust. James Jones accepted the position of a trustee by receiving and administering the property of the estate of William Jones, deceased. He assumed the duties of a fiduciary and should be required to perform those duties.

■ Defendant contends that the plaintiffs come into court with unclean hands and are estopped from claiming a trust. The alleged false statement did not take place between these parties in this suit, and did not injure the defendant. It appears that at the time of the divorce suit, as near as we can ascertain, William Jones, the father, and Forrest Jones were endeavoring to minimize the amount to be paid to Bernice Jones, the wife of Forrest Jones. We do not think that the conduct of the parties referred to was sufficient to support an allegation of unclean hands.

■ The broad principle, that he who comes into a court of equity must come with clean hands, must be taken with reasonable limitations. It does not apply to every unconscientious act or inequitable conduct on the part of the plaintiff. The maxim is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties and arising out of the transaction. It does not extend to any misconduct which is unconnected with the matter in litigation: 1 Pomeroy's Equity Juris. (4th Ed.), 741, § 399.

Defendants, in support of the application of the maxim that "he that hath committed iniquity shall not have equity", cites Bispham's Principles of Equity (8th Ed.) § 42. The illustration there given is as follows: "Thus a party who seeks to set aside a transaction on the ground of fraud must himself be free from any participation in the fraud,  *   *   *." The contention of defendant overlooks the restriction that the participation must be in the fraud. That is further explained in Note 4 to that section, where reference is made to *Monahan v. Monahan,* 77 Vt. 133 (59 Atl. 169, 70 L. R. A. 935), quoted from in *Smith v. Barnes,* 129 Or. 138

(276 P. 1086), (see cases there cited) which holds that where a party is not required to disclose his fraud in making out his case he can have relief. "The test whether a demand connected with an illegal transaction is capable of being enforced at law is whether the plaintiff requires the aid of the illegal transaction to establish his case." (*Monahan v. Monahan,* supra.) See also 21 C. J. 187, § 173, where we read:

"The misconduct which falls within this maxim must have infected the cause of action, so that to entertain it would be violative of conscience. It must relate directly to the very transaction concerning which complaint is made, and not merely to the general morals or conduct of the person seeking relief." *Mason v. Carrothers,* 105 Me. 409 (74 Atl. 1030); *Planters' Bank v. Union Bank,* 16 Wall. 483 (21 L. Ed. 473).

The iniquitous conduct complained of was the fact that, in the divorce suit between Forrest Jones and his wife, Forrest is alleged to have concealed from the court the property which would have come to him by virtue of this trust. Those facts arose in a different transaction involving different parties. The divorce case was closed and determined and not necessary nor material to the issues involved in the present suit. Furthermore, Bernice Platt, then Bernice Jones, was advised of the arrangements and the agreement was read to her by Forrest Jones. It is not claimed that Forrest Jones ever placed any property beyond the reach of creditors. The agreement set forth above did not ripen until all the litigation between Forrest and Bernice was terminated. The circumstances relating to the divorce suit have no application to the doctrine of "unclean hands", and have nothing to do with the present case. James Jones was familiar with all the proceedings relative to the divorce case and assisted in finally settling the rights between these parties. See *Bante v. Bante Devel-*

*opment Co.,* 323 Mo. 649 (19 S. W. (2d) 641, 27 S. W. (2d) 481); *Bently v. Tibbals,* 223 Fed. 247; *Galbraith v. Devlin,* 85 Wash. 482 (148 P. 589). The question of the doctrine of unclean hands is thoroughly discussed by Mr. Justice Rossman in *Smith v. Barnes,* supra, and merits no further mention.

■ In an action against one who has taken title to real estate in trust for the plaintiffs, fraud committed by one beneficiary against another beneficiary of the trust is not material to the defense of the trustee: *Benson v. Murton,* 66 Or. 199 (133 P. 340, 1189).

■■ As we view it, the agreement, of which Exhibit A is a copy, taken together with the will of William Jones, deceased, created an express trust. 65 C. J. 220, §§ 10, 11.

Equity will not permit a person who is a fiduciary to hold property that has been conveyed to him under an agreement or promise that certain conditions attached to it will be complied with. The law in regard to constructive trusts is well stated and epitomized in *Tate v. Emery,* 139 Or. 214 (9 P. (2d) 136), where Mr. Justice Rand quotes from *Becker v. Neurath,* 149 Ky. 421 (149 S. W. 857), as follows:

"It is true that the doctrine of constructive trusts rests upon the ground that the grantor has been induced to part with his title by the fraud of the grantee, but it does not follow from this that it is necessary to show by fact or circumstance actual, intentional fraud practiced at the time by the grantee. When the grantee, by act or word, has induced the grantor to make the conveyance under an agreement or promise that certain parol conditions attached to it will be complied with, the law will imply a fraud from the failure of the grantee to perform the annexed conditions."

In the present case there was the oral promise of the defendant to his father to divide the property with

his brother, and also the father insisted that they go further and sign a formal agreement in writing as to how, when and to what extent the residuary estate should be divided. Defendant has repudiated this agreement, as conclusively shown. Equity and good conscience require that defendant should be charged as a trustee: 1 Perry on Trusts, 267, §166; *Ransdel v. Moore,* 153 Ind. 393 (53 N. E. 767, 53 L. R. A. 753); *In re Everts' Estate,* 163 Cal. 449 (125 P. 1058); *Jasinski v. Stankowski,* 145 Md. 58 (125 Atl. 684, 35 A. L. R. 275, and note 280-321); *Tate v. Emery,* supra.

Section 9-905, Oregon Code 1930, provides that an express trust in real property cannot be created except by writing. The next section provides that this rule can have no application to parol constructive trusts which arise by implication of law from the fraudulent acts of one procuring title to the real property. This has reference more particularly to the oral promise of defendant James Jones to his father. We think, taking the will together with the written agreement proven in the case, that it complies with the sections of the statute referred to, and that it might be deemed an express trust: 1 Perry on Trusts (7th Ed.) 17, § 25. In 65 C. J. 221, § 11, we read:

"The term 'implied trust' is sometimes used to designate a form of express trusts arising from the construction of the language used by the trustor. In this sense implied trusts are defined as trusts that the courts imply from the words of an instrument, where no express trust is declared, but such words are used that the court infers or implies that it was the purpose or intention of the parties to create a trust."

■ The defendant argues that under the circumstances mentioned and the fact that Forrest Jones and Bernice Jones conveyed their interest in the real estate

involved, the plaintiffs are estopped from asserting their rights. The conveyance executed by Forrest Jones and Bernice Jones was in conformity with the agreement which Forrest had made with his father when he turned back the property to him. At that time, owing to domestic troubles, he could not execute a good deed. The real estate so conveyed simply took the place of the mortgages and notes then held against Forrest Jones. Defendant claims that, on account of the statement of Forrest Jones that he claimed no interest in William Jones' estate, he loaned money to Forrest, relying upon such statement, to his financial loss. The record shows these claims have been filed in the estate of Forrest Jones for the money the defendant alleged he advanced. We do not think the testimony shows advances were made to Forrest Jones for the reason suggested by the defendant, but rather as a gesture toward carrying out the promise which defendant James Jones made to his father to assist his brothers and to ward off the claim now made. The defendant did not place himself in an unfavorable position on account of the acts or statement of Forrest Jones. We do not find the essentials of an estoppel. See 21 C. J. 1060, §§ 2, et seq.

### CROSS-APPEAL

Cross-appellants claim there is error in the supplemental findings of fact and decree made by Judge Wilson in the following particulars, to wit: (a) In finding that the value of the residuary estate in the hands of defendant, and for which he should account, was $75,000, instead of $141,938.18; (b) In finding that the lien or claim of plaintiff against the defendant as trustee was the sum of $17,500 instead of approximately $72,000, plus interest, and the value of the use and occupation of

the real estate of Forrest Jones; (c) In finding that James Jones paid or advanced for the benefit of Forrest Jones the sum of $20,000, or that any amount should be credited to the defendant in his accounting as trustee.

In support of assignments (a) and (b) the cross-appellants submit that a trustee is chargeable as an insurer for the amount of the trust fund, with interest, and if he uses the fund in his private affairs, or commingles such funds with his private funds, equity will impress a lien upon all of the property of the trustee. Citing 1 Perry on Trusts (7th Ed.) § 429; 3 Pomeroy's Eq. Juris. (4th Ed.) § 1076, and other authorities.

Judge Wilson found in relation to the value of the property:

"That the value of the residue of the estate of William Jones, deceased, purporting to pass to defendant James Jones under the last will and testament of said William Jones, and pursuant to an order of final distribution made in the settlement of the estate of William Jones, deceased, in the County Court of the State of Oregon for Malheur County, was appraised at a sum approximating $141,900 as of the date of the death of said William Jones; that the probable present day value of said residuary estate, its earning, increment and usufruct from the date of death of said William Jones, and including the value of the real estate particularly described in those certain quitclaim deeds made, executed and acknowledged on the 23d day of November, 1922, wherein Forrest Jones and Bernice V. Jones appear as grantors, and James N. Jones appears as grantee, said quit-claim deeds being found in the records herein as 'Exhibit E' and 'Exhibit F' to the Second Amended Answer of James Jones to Amended Complaint, is the sum of $75,000. That the defendant J. N. Jones has capably and efficiently managed and handled said estate and faithfully accounted for the same and has materially increased the livestock holdings of the estate. That the depreciation in value from

the appraisement as of the death of his ancestor, William Jones, to the present value is due to no fault or failure of the said J. N. Jones and is due to the general economic conditions which have prevailed during the past several years.''

■ The property in question in this suit and the relation of the parties thereto differ from those cases which are cited in cross-appellants' brief where trust funds or other money are wrongfully commingled with moneys of the wrong-doer. Here, at the time of the death of William Jones, James Jones was made the executor of the William Jones will. The circumstances were such that the provisions of the agreement herein quoted could not be carried out until December 2, 1929. It was perfectly proper for James Jones to care for and manage the properties of the estate of his father. There is no complaint here about funds being intermingled with other funds. There were, at that time, about one thousand head of cattle which needed care and attention in the summer and feed in the winter. There was no definite demand upon James Jones to turn over the property in accordance with the agreement until the present suit was instituted. The number of cattle has now increased to about two thousand head.

■ It is not contended that James Jones did not take reasonably proper care of the cattle and of the other property of the estate. In lieu of interest on the value of the trust property claimed by plaintiffs, they should receive the increase of the cattle, numbering about one thousand head, and also a large increase of the number of sheep. The value of the estate of $141,-938.18, which plaintiffs claim should be divided, was taken from the appraisement of the property of the estate for the purpose of estimating the inheritance tax

and a report to the state treasurer and the notice to the county court of the determination of the value of the inheritances. The gross estate was valued at $157,300.56, and the indebtedness against the estate at decedent's death was $18,292.03. The change in the figures of the deductions made the net estate $139,331.36. The appraisement of the property of the estate of William Jones, which is largely for the purpose of fixing the amount of the undertaking, when bonds are required, and determining the amount to be charged to the executor for him to account for, does not fix the present-day value of the property of the estate. It is a matter of common knowledge that during the past few years property, such as belonged to the estate of William Jones, deceased, especially cattle, has decreased in value to a large extent. The executor could not prevent that and it was not attributable to his fault. There seems to be no particular fault found with the executor as to the management of the estate, except the failure to turn the same over to the heirs of Forrest Jones. James Jones, as trustee, having exercised proper care of the trust property, is not responsible for loss caused by devaluation on account of the depression during late years. If a loss happens to a trust fund, in relation to which the trustee has exhibited proper care and prudence, he may be allowed for the loss in his account: 2 Perry on Trusts (7th Ed.) § 914.

On the other hand, the defendant contends that the court should not have decreed the plaintiffs any sum in excess of $5,000, and that the court erred in decreeing the plaintiffs a sum in cash "instead of an interest in the property in kind, subject to the indebtedness of Wm. Jones Estate", incurred on account of the property.

A public accountant, Mr. Roland G. Miles, was appointed and an accounting made for the estate of William Jones, deceased, for the period from June 25, 1928, to September 1, 1933. It is explained that the values used for the closing inventory were determined as to cattle and sheep by Fred A. Phillips, who is admittedly competent therefor. They were based on a count furnished by defendant, who worked in conjunction with the auditor in obtaining data for such account. We find no evidence of the value of the real estate. The figures $31,393 in the closing inventory were taken from the original appraisement of the real estate, or rather of the three notes, each for $21,538.44, given by the three sons to the father, and secured by mortgages on their respective portions of the land; one appraised at $9,333, one for $15,000, and one for $10,000, making $34,333, which stood in the place of the appraisement of the real estate and which was reduced by the sale of a part thereof. We believe a fair valuation of the personal property as of August 31, 1933, is contained in the auditor's report. The whole of the property, real and personal, is subject to an indebtedness, mortgages and accrued taxes of that date, amounting to $65,059.75.

The amount of the outstanding mortgage on the cattle in favor of a loan company of Idaho is given by James Jones as $26,000 "and something". This amount can easily be made exact by the circuit court, which it is hereby authorized to do, but not from the records here.

The closing inventory of August 31, 1933, of the estate of William Jones, deceased, made by the auditor, sanctioned by defendant and made a part of his account,

Schedule No. 2, leaving out the real estate, is as follows:

"Cattle, 1,818 head .............................$37,621.50
Horses, 42 head ................................. 840.00
Sheep, 2,281 head ............................. 8,268.00
Automobiles ...................................... 800.00
Hay, 1,200 tons ................................ 8,400.00
Household furniture ......................... 500.00
Farm implements and machinery 1,255.00
Bank stock ........................................ 18,225.00

Total personal property ............................ $75,909.50
Deducting amount of chattel mortgage... 26,000.00

Net amount of personal property ........... 49,909.50
Deduct net sum found by the trial court
    as advances made by James Jones to
    Forrest Jones, after deducting off-
    sets and credits ....................................... 20,000.00

Leaves the net amount of personal
    property .................................................... 29,909.50
One-half of which is ...................................... 14,954.75"

the net amount of the charge to be made herein against defendant James Jones on account of the personal property of the estate of William Jones, deceased, now held for the benefit of the estate of Forrest Jones, deceased, and for the legatees, devisees, plaintiffs and intervening plaintiffs herein, and which is the net amount of the value of the lien held by Forrest Jones in his lifetime, as of the date, August 31, 1933, together with interest thereon from said date at the rate of six per cent per annum. This amount should be paid over and distributed as provided in the decree and findings of the trial court, and if not so paid within 30 days after entry of the decree in the circuit court, said personal property shall be sold by order of the circuit court, first selling the marketable animals, subject to the chattel mortgage above mentioned.

Explaining and balancing the accounts:

James Jones has received from Estate of Wm.
  Jones, Dec'd, net ............................................$49,909.50
Deduct amount to be paid to Estate of For-
  rest Jones, Dec'd ............................................ 14,954.75

  Total ............................................................$34,954.75
Forrest Jones has received from Estate of
  Wm. Jones, Dec'd, advances ..........................$20,000.00
Add amount to be received by Estate of For-
  rest Jones, Dec'd ............................................ 14,954.75

  Total ............................................................$34,954.75

showing each received the same amount.

The defendant James Jones is hereby declared to be trustee and to hold in trust an undivided one-half part of the real estate particularly described in those certain quitclaim deeds made, executed and acknowledged on November 23, 1929, wherein Forrest Jones and Bernice V. Jones appear as grantors and James N. Jones appears as grantee, the quitclaim deeds being found in the records herein as Exhibit E and Exhibit F to the second amended answer of James Jones to the amended complaint (not including real estate heretofore sold and conveyed by James Jones) for and as the interest of the estate of Forrest Jones, and for his legatees and devisees, plaintiffs and intervening plaintiffs herein in the real estate belonging to the estate of William Jones, deceased, subject to one-half of the lien of mortgage thereon, the whole amounting to approximately $35,378.25, one-half of which should be deemed a lien upon the interest of plaintiffs, and one-half of the accrued taxes.

James Jones is hereby required to make, execute and deliver to the estate of Forrest Jones, deceased, and for his legatees, devisees, plaintiffs and inter-

vening plaintiffs herein, a good and sufficient deed of conveyance of an undivided one-half interest in said real estate, within 30 days from date of entry of the mandate herein in the circuit court, and if defendant fails and neglects to so execute such deed, the decree shall stand in the place of and be of the same force and effect as such deed, such deed or decree to be of the same force and effect as though executed or rendered on August 31, 1933.

■ We refrain from attempting to fix the value of the real estate with no evidence in regard thereto. Such a decree depends upon the equities and circumstances of each particular case, and the court should adjust the relief so as to afford fair protection to the rights of all the parties: 65 C. J. 1067, § 996.

The report of the auditor shows that the hay raised upon the real estate, presumably during one season, amounts to 1,200 tons of the value of $8,400, and it does not seem possible that the appraisement of the notes mentioned can be taken as a fair valuation of the real estate involved herein.

We approve the finding of the circuit court as to the costs and disbursements, including the expenses of the accountant. The plaintiffs and intervening plaintiffs are entitled to judgment for costs and disbursements in this court.

The decree of the lower court will be modified in accordance herewith. The circuit court is hereby authorized to make any order or take any proceedings necessary to carry the decree of this court into effect.

Modified.

BELT, J., not sitting.

Former opinion modified on petition for rehearing January 22, 1935

ON PETITION FOR REHEARING

(39 P (2d) 955)

BEAN, J. Both parties have filed a petition for rehearing and faithfully endeavored to assist the court in the determination of the matters herein involved.

In the final inventory made by the auditor, there were some important items of property, the value of which was taken from an old appraisement, and the testimony in regard to arriving at the value of the bank stock was understood to mean that that item included notes as well. Therefore, a restatement of the account will be made. We think the auditor's report is accurate, but it would probably be understood better by a book-keeper than by the writer. No objection to the auditor's report was filed.

It is understood that the items of household furniture and farm implements and machinery, the values of which are contained in the inventory of the auditor, are satisfactory to both parties. The testimony in regard to values thereof is meager.

The closing inventory of August 31, 1933, of the estate of William Jones, deceased, of personal property upon which the value was fixed by the testimony, or understood to be satisfactory to both parties, is as follows:

| | |
|---|---:|
| Cash on hand | $ 763.02 |
| Cattle, 1818 head | 37,621.50 |
| Horses and mules, 42 head | 840.00 |
| Sheep, 2281 head | 8,268.00 |
| Automobiles | 800.00 |
| Hay, 1200 tons | 8,400.00 |
| Household furniture | 500.00 |
| Farm implements and machinery | 1,255.00 |

Total personal property of which the value was fixed....  $58,447.52

| | | |
|---|---:|---:|
| Deducting amount of chattel mortgage on cattle | $26,512.64 | |
| Accrued interest on same | 349.92 | |
| Unsecured note of Bank of Malheur | 6,000.00 | |
| Note of Kate Jones | 1,500.00 | 34,362.56 |
| Net amount | | $24,084.96 |
| Deducting net amount found by the trial court as advances made by James Jones to Forrest Jones, after deducting offsets and credits | | $20,000.00 |
| Leaves net amount of the personal property for which the value is fixed | | $ 4,084.96 |

One-half of this sum, $2,042.48, is the net amount of the charge to be made herein against defendant James Jones on account of the personal property of the estate of William Jones, deceased, of which the value is fixed by the testimony, or is satisfactory to the parties, for which a money judgment should be entered in favor of the estate of Forrest Jones, deceased, and for the legatees, devisees, plaintiffs and intervening plaintiffs herein, as the lien held by Forest Jones in his lifetime, as of the date of August 31, 1933, together with interest thereon from said date at the rate of six per cent per annum. This amount should be paid over and distributed as provided in the decree and findings of the trial court, and if not so paid within 60 days after entry of the decree in the circuit court, such personal property shall be sold by order of the circuit court, subject to the chattel mortgage above mentioned.

In addition to the amount of money judgment there is belonging to said estate of William Jones, deceased,

to be divided in kind equally between defendant James Jones and the plaintiffs, the following:

Bank stock, old appraisement ........................ $18,225.00

Money, notes and accounts, with interest
thereon, estimated at ..................................... 22,535.83

The auditor, at the time of making up the account, made up a set of books, which are part of the record in the case but were not sent up to this court. The figures in this statement, as to interest on unsecured notes, will be subject to correction by the circuit court. The amount of the chattel mortgage and interest in favor of the Loan Company of Idaho is not definitely fixed in the record, and also it is understood that there are some costs and expenses in relation to the same, all of which the circuit court is hereby authorized to determine and adjust.

The defendant James Jones is hereby declared to be trustee and to hold in trust an undivided one-half part of any and all of the real estate belonging to the estate of William Jones, deceased, a major part of which is particularly described in those certain quitclaim deeds made, executed and acknowledged on November 23, 1929, wherein Forrest Jones and Bernice V. Jones appear as grantors and James N. Jones appears as grantee, the quitclaim deeds being found in the records herein as Exhibits E and F to the second amended answer of James Jones to the amended complaint, excepting the real estate heretofore devised by William Jones, deceased, or sold and conveyed by James Jones, said undivided one-half part to be for and as the interest of the estate of Forrest Jones, deceased, and for his legatees, devisees, plaintiffs and intervening plaintiffs

herein, in said real estate, subject to one-half of the following mortgages thereon:

| | |
|---|---|
| Mortgage of Western Loan & Investment Co. | $17,851.41 |
| Accrued interest on same | 1,561.05 |
| Mortgage of Federal Land Bank | 5,807.49 |
| Together with accrued interest thereon, the whole amounting to approximately | $25,219.95. |

One-half of which, together with one-half of the accrued taxes, should be deemed a lien upon the interest of plaintiffs. All of said real estate should be particularly described in the decree entered in the circuit court. James Jones is hereby required to make, execute and deliver to the estate of Forrest Jones, deceased, for the legatees, devisees, plaintiffs and intervening plaintiffs herein, a good and sufficient deed of conveyance of an undivided one-half interest in said real estate, within 30 days from the date of entry of the mandate herein in the circuit court, and if defendant fails and neglects to so execute such deed the decree shall stand in the place of and be of the same force and effect as such deed, such deed or decree to be of the same force and effect, as far as the rents, issues and profits of said real estate, if any, are concerned, as though the same was executed or rendered on August 31, 1933.

In addition to the notes and accounts above mentioned, James Jones is required to pay to the plaintiffs one-half of all the money collected on such notes and accounts since August 31, 1933. The amount of interest on the two unsecured notes above mentioned is not shown in the record, and such interest will be subject to computation, by the circuit court, or under its supervision, and adjustment of the same, James Jones to

pay and satisfy said two unsecured notes as well as the notes and chattel mortgage of the Loan Company of Idaho, up to the amount deducted from the value of the cattle and other personal property.

■ The parties hereto seem to be in agreement as to dividing the notes and accounts in kind, and we. think that, notwithstanding there are some objections on the part of plaintiffs, the bank stock should be divided in the same manner. There is no value of such bank stock shown in the testimony or in the record, and it is extremely hazardous in these times to fix the value of bank stock fairly for the interest of all parties.

While some question was raised in regard to the expenses incurred by James Jones, we think the expense account is equitable. It seems fortunate for all concerned that there remains as much of the estate property of William Jones, deceased, as there is, after the perilous times of the depression.

■ It is suggested in the brief of plaintiffs on petition for rehearing that one of the notes given by James Jones was for the benefit of the Bank of Malheur. Nothing was said about this matter at the trial and it is not properly before this court. The decree herein will be without prejudice to any adjustment between the parties in this suit and the Bank of Malheur.

There may be several matters for settlement that occurred since August 31, 1933, if not adjusted by agreement of the parties, such as the value of the rents, issues and profits of the real estate, if any, which the circuit court is hereby authorized and requested to adjust in this suit upon the same being presented by a petition or motion, or in some appropriate manner, by either of the parties. Likewise, in regard to the management of the real estate or other property described herein and the administration of the trust de-

clared, the circuit court should make such orders and take such proceedings as may be necessary for the proper administration of the trust estate.

Several matters are discussed in the briefs on petition for rehearing which we have carefully examined and considered, but do not deem it necessary to further discuss.

As stated, we approve the findings and decree of the circuit court as to the costs and disbursements, including the expense account of R. G. Miles, except that the auditor should be paid by James Jones. The plaintiffs and intervening plaintiffs are entitled to judgment for costs and disbursements in this court.

Our former opinion will be changed in accordance herewith.

BELT, J., not sitting.